**The NATIONAL BASKETBALL AS-SOCIATION and NBA Properties, Inc., Plaintiffs,**

v.

**SPORTS TEAM ANALYSIS AND TRACKING SYSTEMS, INC., d/b/a Stats, Inc., and Motorola, Inc., d/b/a Sportstrax, Defendants.**

**No. 96 Civ. 1615 (LAP).**

United States District Court,
S.D. New York.

July 19, 1996.

Corrected Aug. 2, 1996.

Roger L. Zissu, Weiss Dawid Fross Zelnick & Lehrman, P.C., New York City, for The National Basketball Association and NBA Properties Inc.

Edward F. Maluf, Piper & Marbury, L.L.P., New York City, for Sports Team Analysis and Tracking Systems, Inc.

Herbert F. Schwartz, Patricia A. Martone, Vincent N. Palladino, Fish & Neave, New York City, Roger H. Dusberger, Motorola, Inc., Schaumburg, IL, for Motorola, Inc.

PRESKA, District Judge:

Plaintiffs The National Basketball Association and NBA Properties, Inc. (collectively, "NBA") bring this action complaining of the sale of SportsTrax, a portable electronic beeper device created and marketed by defendants Sports Team Analysis and Tracking Systems, Inc. ("Stats") and Motorola, Inc. ("Motorola") (collectively, "defendants") which provides real-time information about NBA basketball games. NBA alleges claims for infringement under the Copyright Act of 1976, 17 U.S.C. § 501; commercial misappropriation under New York common law; false advertising and false designations of origin under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); and violations of the Communications Act of 1934, 47 U.S.C. § 605.[1] Motorola alleges a counterclaim for NBA's tortious interference with its contractual relations with four NBA teams.

NBA moved, by order to show cause, for a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure. Following oral argument, a hearing was held on the preliminary injunction (the "Hearing"), at the conclusion of which I reserved decision. The parties subsequently agreed to consolidate the Hearing into a trial on the merits for the issues of liability and injunctive relief, submitted supplemental briefing, and attended another oral argument. The issue of damages has, by agreement of the parties, been reserved for a subsequent decision if necessary.

As set forth in detail below, I find that through the SportsTrax product, defendants disseminated to NBA fans game information

---

1. Although NBA's fourth claim for relief alleges that defendants' false designations of origin also violate New York common law and New York General Business Law §§ 349–50, NBA failed to pursue this claim in its legal memoranda other than in a footnote contending that the "standards for claims of unfair competition under New York law are similar to those under § 43(a) of the Lanham Act." (Memorandum of Law in Support of Plaintiffs' Order to Show Cause for a Preliminary Injunction and Expedited Discovery ("OSC Supp.Memo.") at 14 n. 3 (citing *American Footwear Corp. v. General Footwear Co. Ltd.*, 609 F.2d 655, 664 (2d Cir.1979), *cert. denied*, 445 U.S. 951, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980)).) Accordingly, I will discuss only NBA's Lanham Act claims at any length.

**1128**

on a real-time basis.[2] In so doing, they have misappropriated the essence of NBA's most valuable property—the excitement of an NBA game in progress. Because defendants have "reap[ed] where [they] ha[ve] not sown," *International News Serv. v. Associated Press,* 248 U.S. 215, 239, 39 S.Ct. 68, 72, 63 L.Ed. 211 (1918), NBA is entitled to injunctive relief. Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the following shall constitute findings of fact and conclusions of law in support of this decision.

## TABLE OF CONTENTS

FINDINGS OF FACT
    I.    Parties and Amici ..................................................... 1128
    II.   The Business of NBA Games: Real–Time Data ............................ 1129
        A.   The Value of Real–Time Data ...................................... 1129
        B.   The Controlled Dissemination of Real–Time Data ...................... 1130
        C.   NBA's Real–Time Data System: Gamestats ............................ 1132
   III.  SportsTrax: "Any Game ● Any Team ●
               Any Time ● Any Where" ................................... 1132
        A.   The Product ...................................................... 1132
        B.   The Marketing ................................................... 1133
        C.   The Negotiations ................................................. 1136
CONCLUSIONS OF LAW
    I.    Laches Defense ....................................................... 1138
    II.   Prior Restraint Defense ............................................... 1138
   III.  Copyright Infringement Claim ......................................... 1140
        A.   NBA Game Is Not Protected ....................................... 1140
        B.   Copyright In Broadcast Is Not Infringed ............................ 1145
   IV.  Commercial Misappropriation Claim ................................... 1146
        A.   Preemption by Copyright Act: NBA Games v. Broadcasts of NBA
            Games ......................................................... 1146
            1.   General Scope Requirement ..................................... 1147
            2.   Subject Matter Requirement .................................... 1149
        B.   Defendants' Misappropriation ...................................... 1150
    V.   Lanham Act Claims ................................................... 1159
        A.   No Contributory Infringement ..................................... 1160
        B.   No False Advertising ............................................. 1161
        C.   No False Designations of Origin .................................... 1162
   VI.  Communication Act Claim ............................................ 1164
  VII.  Interference With Contractual Relations Counterclaim ..................... 1166
 VIII.  Entitlement to Injunctive Relief ........................................ 1166
CONCLUSION ................................................................ 1166

---

### FINDINGS OF FACT

Upon assessing the evidence in the record, operating and observing SportsTrax, and taking into account my observations of the demeanor and assessments of the credibility of those witnesses who testified at the Hearing, I find the following to be facts in this action.

### I. *Parties and Amici*

1. Plaintiff The National Basketball Association ("TNBA") produces, organizes, and markets pre-season, regular season, and playoff basketball games involving its twenty-nine member teams. (Affidavit of TNBA President of Television and New Media Ventures Edwin S. Desser ("Desser Aff.") ¶ 3.)

---

**2.** As used herein, "real-time" refers to information about an ongoing NBA game, such as changing scores, disseminated while the game is in progress. (Testimony of TNBA President of Television and New Media Ventures Edwin S. Desser, Transcript ("Desser, Tr.") at 21; Testimony of Stats President and Chief Executive Officer John Dewan, Transcript ("Dewan, Tr.") at 459–60.)

2. Plaintiff NBA Properties, Inc. ("NBA Properties") has the exclusive worldwide rights to market and promote NBA games and, accordingly, controls and manages TNBA's intellectual property rights. (*Id.* ¶ 4.)

3. Defendant Stats provides information about sports, both current and historical, to the public and to various media entities, such as the Associated Press, ESPN, Fox, Turner, NBC Sports, and a majority of Major League Baseball teams. (Affidavit of Stats President and Chief Executive Officer John Dewan ("Dewan Aff.") ¶ 3.) It also gathers and provides the real-time NBA game data which is displayed by SportsTrax.

4. Defendant Motorola develops and markets, *inter alia*, paging devices which relay a variety of information, from telephone numbers to weather reports.[3] (Affidavit of SportsTrax Products, Inc.[4] President Michael Marrs ("Marrs Aff.") ¶ 3.) It is responsible for the manufacturing and marketing of SportsTrax.

5. Amicus curiae The National Football League ("NFL") is an unincorporated not-for-profit association comprised of thirty member clubs engaged in the business of creating, organizing, promoting, and exhibiting professional football games. (Memorandum of Law Submitted by the NFL, The Office of the Commissioner of Baseball ("MLB") and the National Hockey League ("NHL") as Amicus Curiae ("NFL Memo.") at 2.)

6. Amicus curiae Office of the Commissioner of Baseball is an office serving the twenty-eight clubs, that are members of either The American League of Professional Baseball Clubs or The National League of Professional Baseball Clubs, which are in the business of creating, organizing, promoting, and exhibiting professional baseball games.

7. Amicus curiae NHL is a joint venture engaged in the business of creating, organizing, promoting, and exhibiting the profession-

al hockey games of its twenty-six member teams. (*Id.* at 3.)

8. Amicus curiae The Associated Press ("AP") is a not-for-profit mutual news cooperative whose members are newspapers, television stations, and radio stations. (Brief Amicus Curiae of AP in Opposition to Plaintiffs' Request for Injunctive Relief ("AP Memo.") at 1). As the world's largest and oldest news gathering organization, AP is in the business of gathering and distributing news, including sports news, to its members and subscribers. (*Id.*)

9. Amicus curiae America Online, Inc. ("AOL") operates an online computer service providing a wide range of information for over six million subscribers worldwide. (Memorandum of Law Amicus Curiae of AOL in Support of Defendants ("AOL Memo.") at 1.) Stats offers a scoreboard feature on AOL, which provides regularly updated information about ongoing NBA games. (*Id.* at 2.)

10. Amicus curiae The New York Times Company ("NYT") publishes *The New York Times* newspaper and has been in the business of reporting and distributing news for over a century. (Memorandum of Law of Amicus Curiae NYT at 1.)

## II. The Business of NBA Games: Real–Time Data

### A. The Value of Real–Time Data

11. The vast commercial value and appeal of NBA games is beyond dispute.

12. Much of this value and appeal is attributable to years of NBA's promotional investments.

13. Currently, NBA's primary promotional announcement consists of the series of thirty-second advertisements with the theme, "I Love This Game." (Testimony of TNBA President of Television and New Media Ventures Edwin S. Desser, Transcript ("Desser, Tr.") at 160; Exhibit ("Ex.") 141.) NBA typically runs one or two of these advertise-

---

**3.** Although Motorola engages in a wide variety of other business undertakings, I need not list each of these undertakings for the purposes of this decision.

**4.** This entity is a wholly owned subsidiary of Motorola. (Marrs Aff. ¶ 1.)

ments in each network telecast of an NBA game and produces roughly twenty to thirty per year. (Desser, Tr. at 161.)

14. It is also beyond dispute that NBA games achieve the apex of their value while they are in progress. In fact, roughly 80% of NBA's revenues are derived from the promotion of NBA games while they are in progress, such as from broadcast distribution licenses and admission fees to the arenas. (*Id.* at 11.) [5]

15. The National Broadcasting Company ("NBC"), for example, pays NBA approximately $3 million per game for the national network television broadcast rights to NBA games. (*Id.* at 53–54.)

16. Turner Broadcasting ("Turner") pays NBA approximately $1 million per game for the rights to televise nationally 115 regular season and playoff games. (*Id.* at 54.)

17. ESPN Radio pays NBA approximately $50,000 to $100,000 per game for the national radio distribution rights for NBA games. (*Id.*)

18. In addition to these national broadcast agreements, NBA has a series of local and regional license agreements. (*Id.*) In the New York Metroplex, NBA has agreements with MSG Network and Sports Channel, which carry New York Knicks and New Jersey Nets games respectively. (*Id.*)

19. Further, NBA has a license agreement with TRZ Communications, which takes audio descriptions of NBA games and distributes them via a 1–800 number (1–800–HEAR–NBA) to listeners who are not in the vicinity of a radio or television broadcast of an NBA game. (*Id.* at 13, 54.) Callers are charged a fee in exchange for which they can select a game currently in progress and hear a play-by-play broadcast of the game. (*Id.* at 106–07.)

20. NBA fans also can pay approximately $149 per year as a subscriber to League Pass, a satellite service which allows the subscriber to view 1,000 games (virtually every televised game) over the course of a season. (*Id.* at 55.)

**B. *The Controlled Dissemination of Real–Time Data***

21. Although NBA relies on this public dissemination of real-time NBA game data to enhance public interest in NBA games, it must, in order to preserve the value of its proprietary interest in this information, impose limitations on its dissemination.

22. NBA's license agreements represent one limitation.

23. Another limitation is NBA's media credentials. These media credentials ensure that entities, despite the legitimacy of their news gathering and dissemination functions, are not able to disseminate real-time information which is comparable to that provided by NBA's paying licensees without compensating NBA.

24. In this manner, NBA balances the goals of informing the public about, and attracting interest in, NBA games, on the one hand, and preserving its ability to derive revenue from the sale of real-time NBA game information, on the other hand. (*Id.* at 99.)

25. Credentialed media entities are admitted to the arenas and are permitted to provide post-game reports and, to a more limited extent, reports of NBA games while they are in progress. (*Id.* at 14.) [6]

26. According to NBA's 1995–96 Media Pass:

Television and radio stations may use excerpts of NBA games only in the manner and on the terms and conditions set forth in the NBA's Video and Audio Highlights Licenses, receipt of which is acknowledged. Any other use requires prior specific written approval from the NBA.

The use of any photograph, film, tape or drawing of the game, player interviews or other arena activities taken or made by the accredited organization or the individual

---

5. An example of revenue which NBA earns after the conclusion of a game is the sale of videotapes of each game for roughly $1,000 to $5,000 per minute of footage. (Desser, Tr. at 56.)

6. As for post-game reporting, NBA's primary restriction is that the reporting is news reporting rather than for a commercial use. (*Id.* at 14–15.)

for whom this credential has been issued shall be limited to news coverage of the game by the organization to which this credential is issued unless expressly authorized in writing by the NBA.

Permission to film or tape NBA games may be revoked at any time by the NBA.

All ownership, copyright and property rights in the NBA games, telecast thereof and in the events and activities conducted in the arena shall remain the sole property of the NBA and no such rights are conferred or intended to be conferred or created on behalf of any other person or entity by the issuance of this credential. (Ex. 324.)

27. NBA's Media Guidelines provide further specifications for photographers, cameramen, and the electronic media, and they limit the nature of the media's use of video highlights of NBA games. (Ex. 136.)

28. The electronic media restrictions state:

No electronic media personnel shall transmit scores and/or other game information out of an NBA arena (by telephone or by any other means) more than three times during each quarter and once during each of the two quarter breaks without the prior specific written approval of the NBA; provided, however, that in the event that such game involves one or more "overtime" periods, two additional transmissions per overtime period (once during the overtime period and once during the break immediately prior to the start of such overtime period) shall be authorized without the prior written approval of the NBA; and provided, further, that no such transmission shall exceed thirty seconds in length. The limitation on transmissions contained in the preceding sentence shall not be applicable during pre-game, postgame, or half-time of the game.

(Id.)

29. The video highlights restrictions provide, inter alia, that game highlights: "may be used only for news purposes in regularly scheduled news programs up to 72 hours after the completion of the game," "may not exceed two minutes" for any one NBA game

that has been completed, "may only include Highlights of the first half" of an ongoing NBA game, and "may not incorporate announcer commentary from game telecasts." (Id.)

30. SportsTicker, which is owned by ESPN (Desser, Tr. at 104), is one of the entities to which NBA has provided its media credentials. Based on game updates from its representatives in the arenas, SportsTicker distributes electronically the score and time remaining three times per quarter and once at the end of the quarter. It creates a data feed with this information and sells the information to its clients. (Id. at 100).

31. NBA does not control SportsTicker's decisions as to who receives its data feeds; NBA only regulates the frequency and types of information which SportsTicker may provide. (Id. at 104.)

32. One product which uses SportsTicker's data feed is "ESPNET To.Go," a pager device manufactured by Motorola which distributes sports information about ongoing Major League Baseball, NFL, NBA, NHL, and Division I NCAA football and basketball games. (Id. at 41–42, 59; Exs. 73, 327.)

33. In addition to the promotional benefits provided by other entities with media credentials, SportsTicker provides NBA teams with the scores to other NBA games around the league, which are displayed for fans in each arena. (Desser, Tr. at 55.)

34. For the same reason that NBA restricts the dissemination of real-time information by media entities, NBA also places restrictions on patrons who view NBA games from the arenas.

35. The back of admission tickets states: "By your use of this ticket . . . you agree that you will not transmit or aid in transmitting any description, account, picture or reproduction of the event to which this ticket invites you." (Ex. 83.)

36. Further, NBA places signs at the entrances to the arenas and mails publications to season ticket holders which contain similar restrictions. (Desser, Tr. at 113.)

### C. NBA's Real–Time Data System: Gamestats

37. Not only does NBA limit what others can do with its valuable real-time NBA game data, but it currently is developing its own system—Gamestats—for capturing and disseminating statistical information about ongoing NBA games. (*Id.* at 23.)

38. NBA first installed Gamestats during the 1994–1995 NBA season. (*Id.* at 249.)

39. Its full development, however, consists of four phases.

40. Phase I, which has been completed in most respects, is the development and implementation phase of the software used to operate Gamestats. (*Id.* at 35.)

41. At this time, all twenty-nine arenas and all twenty-nine teams are using Gamestats, with the assistance of NBA's two-hundred page user's manual (Ex. 326), as the primary system for entering and capturing the statistics of NBA games. (Desser, Tr. at 35.) NBA currently uses Gamestats to generate the official play-by-play game sheet and the half-time and post-game box scores, to provide information to broadcasters announcing the games and to allow television stations to update their on-screen graphics, and to distribute information throughout the arena in which the game is being played for use by members of the press and those in luxury suites. (*Id.* at 34.)

42. Phase II, which the NBA plans to have operational for the 1996–1997 basketball season, is the development of a network linking the Gamestats data from all twenty-nine arenas. (*Id.* at 35.) At present, Gamestats does not have the capability to provide real-time data outside of a particular arena. (*Id.* at 253.)

43. Phases III and IV consist of further enhancements to Gamestats to achieve its objectives of creating and collecting game statistics and interfacing these statistics with arena clocks and scoreboards, networking this information among the arenas, and mak-

ing this information available for commercial use. (Ex. 144.)

44. NBA recently has been involved in discussions with various entities in order to market Gamestats. These entities include ESPN, SportsTicker, Time Warner, Intel, IT Network, and even defendants. (Desser, Tr. at 40–42.)

45. NBA expects to receive almost $1 million from license fees for the first year in which it has the capability to license real-time data from Gamestats. (*Id.* at 57.)

46. Although NBA presently does not have any agreements with beeper manufacturers for a product analogous to SportsTrax or ESPNET To.Go (*id.* at 105), NBA intends to provide a Gamestats data feed to a pager product once Gamestats has the capability to provide real-time information beyond the particular arena in which the game is being played (*id.* at 206–07, 253).

### III. SportsTrax: "Any Game ● Any Team ● Any Time ● Any Where" [7]

47. In January 1996, defendants' product—SportsTrax—presented retail consumers with another means of acquiring real-time information about NBA games.

### A. The Product

48. At its core, it provides real-time "Basketball Action Wherever You Go." (Ex. 8–D ("Retail Box").)

49. More specifically, it allows the consumer to follow all NBA games, including playoff games, being played around the nation at any particular time by regularly updating its displays of the score, quarter, ball possession, time remaining, and team in the bonus while the games are in progress. (Retail Box.) [8]

50. These updates appear on a display screen which depicts a basketball court. (Ex. 8–B ("SportsTrax Device").)

---

**7.** This is a quotation from the retail display stand, Exhibit 252.

**8.** A basketball game is comprised of four quarters, with each quarter lasting twelve minutes of

regulation time and about one-half of an hour of actual clock time. (Desser, Tr. at 97; Testimony of SportsTrax Products, Inc. President Michael Marrs, Transcript ("Marrs, Tr.") at 400.)

51. SportsTrax also designates whether a team is the home or visiting team and it has audible alerts which indicate the start of a game, the end of a period, the six minute warning, the two minute warning, and all game updates. (Retail Box; Ex. 8–C ("User's Guide") at 14.) [9]

52. The consumer receives these, as well as some other specialized features,[10] for "exciting basketball action in the palm of your hand." (Retail Box.)

53. By providing "up-to-date information on all National Basketball Association teams," SportsTrax is the consumer's "personal viewing window into the exciting world of Pro Basketball." (User's Guide at 2, 3.)

54. Its operation is analogous to that of a television, with each "channel" of SportsTrax "showing a different Basketball game" and "a channel for every game being played that day." (*Id.* at 3.)

55. Once a particular game begins, "the start times are replaced with live updates about the progress of the games," thus allowing the consumer to "flip the channels and view the status of any and every game being played that day." (*Id.*)

56. As these advertised features make clear, SportsTrax is designed and marketed as a commercial entertainment product for NBA fans. (Testimony of SportsTrax Products, Inc. President Michael Marrs, Transcript ("Marrs, Tr.") at 275; Ex. 251; Testimony of Stats President and Chief Executive Officer John Dewan, Transcript ("Dewan, Tr.") at 458–59.)

57. It "is designed for those times when you cannot be at the arena, watch the game on TV, or listen to the radio and a slight delay is acceptable." (User's Guide at 14.)

58. Although SportsTrax has the capability to deliver real-time information about NBA games as fast as that information is sent to the device (Marrs, Tr. at 281), "status updates are usually received within two min-

utes of the on-court activity" (User's Guide at 14).

59. Toward the end of competitive NBA games, however, SportsTrax often updates more frequently than every two minutes. (Marrs, Tr. at 281–282, 402–04; Dewan, Tr. at 545.) In fact, updates sometimes occur numerous times within one minute. (Ex. 285.)

60. The updates presented by SportsTrax are provided to Motorola by Stats. (Dewan, Tr. at 466.)

61. Stats, however, does not have reporters in the arenas or at the press tables; instead, it pays reporters $10 per game to watch NBA games on broadcast and cable television and to listen to radio broadcasts. (*Id.* at 466, 468.)

62. Accordingly, some of the information relied on by Stats' reporters may be that which Gamestats provided to the broadcast announcers (especially for the radio broadcasts where Stats' reporters do not view the game independently). (*Id.* at 473–77.)

63. Two reporters cover each game. (*Id.* at 473.) They watch or listen to the broadcasts and type information, such as successful shots, missed shots, fouls, and clock updates, into computers which calculate various statistics and relay them for eventual transmission to SportsTrax devices. (*Id.* at 473–74.)

64. Two or three night editors monitor the information relayed by the reporters for a particular night's games to address any discrepancies between the two reporters covering each game. (*Id.* at 485.) Stats' software also has built-in corrective features. (*Id.* at 479.)

### B. *The Marketing*

65. The marketing of SportsTrax is the responsibility of Motorola.

66. While marketing SportsTrax at the wholesale level, Motorola occasionally used

---

**9.** The audible alerts may be turned off for those times when the consumer is "in meetings, at school, at the theater, in places of worship, or any other location where the alert tones may disturb others." (User's Guide at 13.)

**10.** For example, the consumer can review the final NBA scores from the previous day and the scheduled start times for the current day's games. (Retail Box.)

the acronym "NBA" to describe SportsTrax, such as referring to it as the "NBA SportsTrax." (Marrs, Tr. at 283–84; Exs. 228, 250, 251, 361.)

67. Motorola's retail advertising also refers to "NBA games" (Ex. 63 ("Point-of-Sale Flyer")), "National Basketball Association teams," "Pro games," "Pro Basketball," "Pro Basketball Teams," (User's Guide at 2, 3, 9) and "29 Pro Basketball Teams" (Retail Box).

68. Similarly, it states the team names and uses terms such as "Eastern Conference" and "Western Conference." (User's Guide at 9.)

69. Motorola uses these terms descriptively to explain in an intelligible fashion the type of information conveyed by SportsTrax and its operation. Motorola attempts to make clear, for example, that SportsTrax does not display NCAA (or collegiate level) basketball updates. (Marrs, Tr. at 286, 325–26.)

70. Motorola also made statements relating to the origin of the information conveyed by SportsTrax.

71. A January 1996 press release issued by Motorola stated that SportsTrax provides "updated game information direct from each arena" which "originate[s] from the press table in each arena." (Ex. 228; Marrs, Tr. at 297–98.)

72. Marrs approved this press release on behalf of Motorola based on his mistaken belief, from an August 1994 conversation with Stats, that Stats actually gathered its information in this manner. (Marrs, Tr. at 298–301.)

73. The retail box and display stand also advertise that SportsTrax provides updates "from the arena." (Retail Box; Ex. 252 ("Retail Display Stand").)

74. Finally, Motorola made statements about the contemporaneous nature of information conveyed by SportsTrax. It stated in the January 1996 press release that SportsTrax provides "minute-by-minute updates" of NBA games. (Ex. 228.)

75. The record is devoid, however, of evidence that Motorola ever advertised that NBA manufactured, licensed, sponsored, or approved of SportsTrax.

76. The only words on the face of the SportsTrax device are "SportsTrax" and "Motorola."

77. The retail box states in conspicuous letters "Motorola SportsTrax" on every side which has text.

78. Similarly, the user's guide, other than a depiction of the product, has four words written on the cover: "Motorola," "SportsTrax," "User's," and "Guide."

79. Nevertheless, Brookstone, a retailer of SportsTrax, despite conceding that Motorola never stated that SportsTrax was officially licensed (Deposition of Brookstone Employee Jenny J. Van Treese ("Van Treese Dep.") at 5), accidentally stated in one of its retail advertisements that SportsTrax was "officially licensed by the National Basketball Association." (Marrs, Tr. at 287–288.)

80. The drafter of the advertisement, Jenny J. Van Treese ("Van Treese"), without verifying the accuracy of this advertisement, placed a question mark by the "officially licensed" clause in her draft, and incorrectly assumed that the information would be verified by a proofreader and by Brookstone's SportsTrax buyer. (Van Treese Dep. at 33–34, 44–45.)

81. This was part of Van Treese's practice as a writer to "take a little license with what is said" in order to "make it a little more interesting to the reader." (*Id.* at 27.)

82. Motorola first learned of the error in late January 1996. (Marrs, Tr. at 290.)

83. Within approximately ten days thereafter, Motorola wrote a letter to Brookstone to remedy the erroneous advertisement. (*Id.* at 290–91.)

84. Motorola subsequently placed numerous telephone calls to Brookstone to ensure Brookstone's correction of its erroneous advertisement. (*Id.* at 291.)

85. The reference to NBA's license was corrected in Brookstone's next catalogue (*id.* at 292), and Brookstone apologized for the error (Ex. 281).

86. When NBA was made aware of Brookstone's erroneous advertisement, NBA called Brookstone to order a unit, but, prior to this lawsuit, never complained to Brookstone about its false statement. (Desser, Tr. at 78–80.)

87. Hammacher Schlemmer, another retailer of SportsTrax, ran an advertisement primarily focused on the baseball SportsTrax. It referred to the baseball SportsTrax[11] as a "palm-sized electronic marvel that lets you see the play-by-play action of every Major League baseball game." (Ex. 331.) It also noted, correctly according to Motorola, that the baseball SportsTrax was "officially licensed by Major League Baseball." (Id.) Below this portion of the advertisement, Hammacher Schlemmer included a brief description of the basketball SportsTrax, which began: "As above." (Id.)[12]

88. Despite these advertisements and references to terms such as "NBA," "Eastern Conference," and "from the arena," NBA has not received any communications from consumers expressing their confusion as to NBA's sponsorship or approval of SportsTrax. (Desser, Tr. at 107–08.)

89. Similarly, NBA has not conducted any market research or consumer surveys to assess such confusion. (Id. at 108.)

90. Motorola's marketing of SportsTrax also involved negotiating promotion and sales agreements[13] with four NBA teams—the New Jersey Nets (the "Nets"), the Los Angeles Lakers (the "Lakers"), the Los Angeles Clippers (the "Clippers"), and the Orlando Magic (the "Magic"). (Deposition of Nets Employee James Lampariello ("Lampariello Dep.") at 44; Deposition of California Sports Inc.[14] Employee Stephen Chase ("Chase Dep.") at 42; Deposition of Clippers Corporate Marketing Director Adam David Smith ("Smith Dep.") at 27; Deposition of Orlando Magic Fanattic[15] Employee James Winzig ("Winzig Dep.") at 27–28; Exs. 14, 16.)

91. Prior to the commencement of this lawsuit and despite the existence of established procedures for teams to notify NBA

---

11. This device provides real-time information about baseball games and, according to Motorola, is officially licensed by Major League Baseball. In December 1994, it was named "Business Week Product of the Year." (Marrs, Tr. at 306.)

12. Subsequent to the Hearing, NBA submitted a series of more recent retail advertisements for SportsTrax which are received in evidence, although I find these advertisements to be cumulative of those already in the record (NBA proffers these advertisements in connection with its Lanham Act claims).

  Attached to NBA's letter dated June 13, 1996 are two more Brookstone advertisements which continue to use the phrase "NBA basketball games" to describe the type of information conveyed by SportsTrax. (Exs. 385, 386.)

  Attached to NBA's letter dated June 26, 1996 is another Hammacher Schlemmer advertisement from its mid-summer 1996 catalogue (Ex. 387) which is similar in all material respects to the one already in the record (Ex. 331).

  Attached to NBA's letter dated July 2, 1996 is a Best 'N Deal advertisement from its summer 1996 catalogue which refers to "29 pro basketball teams" and states, while describing the baseball and basketball SportsTrax, that they are "[f]rom Motorola and officially licensed by major league and NBA." (Ex. 388.) As discussed herein at paragraphs 318–325 in connection with Brookstone's "officially licensed" advertisement, I am not persuaded that Motorola is contribu-

torily liable for any false references by Best 'N Deal to SportsTrax being officially licensed by NBA. Nor am I persuaded that this advertisement constitutes sufficient evidence of actual confusion of NBA's sponsorship or approval of SportsTrax to satisfy the false designation of origin prong of Section 43(a) of the Lanham Act. See infra paragraphs 340–357 (discussing this prong). NBA's argument would require me to conclude without any basis that Best 'N Deal actually was confused as to whether NBA licensed SportsTrax instead of, for example, fully being aware of the absence of a license but nevertheless drafting its advertisement in this fashion for some other reason, or, as in the case of Brookstone's advertisement, carelessly drafting its advertisement. Further, even if this advertisement represented some amount of actual confusion, I find it to be de minimis. See infra paragraph 351.

13. I use the word "agreement" in connection with these four NBA teams merely to indicate that the parties were involved in discussions or had finalized a business deal. I do not render any holding as to the existence or enforceability of contracts between these parties.

14. California Sports, Inc. owns the Lakers. (Chase Dep. at 18.)

15. The Orlando Magic Fanattic is the entity responsible for selling Magic merchandise. (Winzig Dep. at 18.)

about infringing activities (Ex. 13–A ("NBA Operations Manual 1995–1996") at 236), NBA did not receive any communications from these NBA teams regarding the propriety of their agreements with Motorola. (Desser, Tr. at 88, 111.)

92. Eventually, however, all four teams did have discussions with NBA representatives and ceased doing business with Motorola in relation to SportsTrax. (Lampariello Dep. at 71, 75; Chase Dep. at 87–88; Smith Dep. at 84–86; Winzig Dep. at 26–27, 46–50.)

93. The Nets concluded that SportsTrax was a "renegade product" (Lampariello Dep. at 42) which required NBA approval but lacked the relevant indications, such as an NBA logo or the Nets logo, of this approval. (*Id.* at 38, 40, 64, 66.)

94. The Lakers, after learning of NBA's conflict with Motorola (Chase Dep. at 83–84), recognized the erroneous nature of their assumption that NBA must have approved of SportsTrax in order for it to convey real-time NBA game information (*id.* at 70–71, 101.)

95. Similarly, the Clippers discovered that they erroneously assumed, because the Nets and Lakers already had similar agreements with Motorola, that NBA acquiesced in such agreements. (Smith Dep. at 38.) The Clippers also based their erroneous assumption of NBA acquiescence on their belief that Stats, which provides the information to SportsTrax, also provided similar statistical information to NBA, and on the use by SportsTrax of "LAL" and "LAC" (to refer to the Los Angeles Lakers and Los Angeles Clippers), "Eastern Conference," and "Western Conference." (*Id.* at 95–96, 98.)

96. The Magic, unlike the other teams, had decided that NBA approval was not required because SportsTrax did not use Magic logos or NBA logos (Winzig Dep. at 37, 51).

## C. *The Negotiations*

97. SportsTrax is the outgrowth of lengthy negotiations among NBA, Motorola, and Stats.

98. In September 1994, at the initiation of NBA, Motorola and NBA first met to discuss a potential business relationship involving the dissemination of real-time NBA game information. (Desser, Tr. at 69–71; Marrs, Tr. at 303.)

99. At this time, Motorola already had an agreement with Stats for the SportsTrax Major League Baseball paging device. (Marrs, Tr. 307.)

100. Motorola firmly desired to have the basketball version of SportsTrax selling at the retail level by the outset of the 1995–1996 NBA season. (*Id.* at 276, 316.)

101. Motorola's goal was to preempt any competitors in this potentially prosperous line of products (*id.* at 276–77, 319), to take advantage of the relatively recent favorable press coverage regarding its baseball SportsTrax product (*id.* at 306, 315–16), and to reduce its reliance on the baseball SportsTrax, especially in light of the 1994 baseball player's strike (*id.* at 319–20).

102. Therefore, Motorola was unwilling to wait beyond the fall of 1995 for NBA's Gamestats to be in a position to provide the necessary information for a real-time NBA product. (*Id.* at 315–16, 318–19.)

103. Motorola soon realized, however, that its negotiations with NBA were not leading toward a fall 1995 retail launch date for SportsTrax.

104. Consequently, by March 1995, Motorola had decided to develop its real-time NBA product—SportsTrax—with or without NBA's involvement. (*Id.* at 313–14.)

105. Motorola never informed NBA of this decision. (*Id.* at 320.)

106. In July 1995, Motorola and NBA attended the National Sporting Goods Convention (a trade show) in Chicago. (*Id.* at 278–79, 345.)

107. Among the many promotional items at Motorola's booth were an order form with a preprinted reference to the baseball and basketball SportsTrax (*id.* at 349, 352) and a fiberglass replica of the basketball SportsTrax (*id.* at 358).

108. Nevertheless, no press release regarding the basketball SportsTrax accompanied this July 1995 trade launch of SportsTrax (*id.* at 345, 350–51), the basketball

SportsTrax was not operational at that time (*id.* at 345–46), and Motorola's booth was one of the smallest booths at this show involving thousands of booths (*id.* at 357–58).

109. NBA maintained parallel discussions with Stats during this time frame. (*Id.* at 303–304; Ex. 229.)

110. In May 1994, Desser attended the National Cable Television Association Convention on behalf of NBA. (Desser, Tr. at 174.) Stats maintained a booth at this convention which displayed a videotape on a continuing basis that demonstrated Stats' services, such as updating the scores of ongoing games, for a variety of sports. (*Id.* at 174–178; Dewan, Tr. at 547.) One of these sports was professional basketball. (Marrs, Tr. at 174–178.) The videotape was playing so loudly that even Stats describes it as annoying. (Dewan, Tr. at 547, 572.) Despite this annoyance, NBA representatives visited Stats' booth. (*Id.* at 551; Desser, Tr. at 174.)

111. It was around the time of this convention that NBA and Stats first discussed Stats' becoming an NBA data wholesaler. (Dewan, Tr. at 446, 550; Ex. 242.)

112. Stats, which competes with companies such as SportsTicker (Dewan, Tr. at 466), was "looking to be the exclusive provider of information—of NBA-developed information" (*id.* at 451).

113. NBA's ultimate plan was to rely on Gamestats to provide raw information to Stats, which would then customize the information to be fed for use by a real-time product made by Motorola but associated with NBA. (Desser, Tr. at 256; Dewan, Tr. at 522.)

114. NBA's negotiations with Stats continued through January 1996. (Dewan, Tr. at 503; Ex. 213.)

115. Defendants also negotiated between themselves to develop and market SportsTrax.

116. Defendants recognized that the essence of their product was the provision of timely NBA information. (Marrs, Tr. at 365, 422; Dewan, Tr. at 443, 446; Ex. 237.)

117. They also realized, perhaps due to this central feature of SportsTrax, that they may be required to go forward with NBA's involvement, such as by paying NBA a royalty (Marrs, Tr. at 368–70; Ex. 244 ¶ 3), or else face claims by NBA. In fact, Motorola required an assurance from Stats that Motorola would be protected from potential NBA claims. (Marrs, Tr. at 359–60; Ex. 269.)

118. Stats first provided Motorola with a bid for the provision of real-time NBA information for SportsTrax in September 1995. (Marrs, Tr. at 345–46.)

119. In October 1995, Stats provided Motorola with a draft contract for provision of real-time data for SportsTrax. (Dewan, Tr. at 500.)

120. In January 1996, SportsTrax began selling at the retail level.

121. By the end of January 1996, NBA presented Motorola a letter demanding that it "cease and desist from further advertisement, distribution and sale of the NBA SportsTrax Device." (Ex. 85.)

122. On March 5, 1996, NBA filed this lawsuit.

## CONCLUSIONS OF LAW

123. NBA claims that defendants' conduct regarding SportsTrax[16] constitutes in-

---

**16.** Although NBA also complains of Stats' site on America Online, Inc. ("AOL"), which has provided real-time NBA game data since January 1996 (Dewan, Tr. at 505), this complaint is one made at the eleventh hour and one which I will not address herein.

This action has been about SportsTrax from the beginning. NBA did not sue AOL, the complaint refers to AOL only one time (Complaint ¶ 25), and the evidence proffered at the Hearing failed to include any demonstration of the AOL site, whether on a computer or by a videotaped

demonstration. The only testimony at the Hearing about the operation of the AOL site is that of Dewan, wherein he briefly noted that Stats provides minute-by-minute updates for its AOL basketball site and that these updates originate from the same data feed which Stats provides to Motorola for SportsTrax. (Dewan, Tr. at 510.) Further, defendants do not rely on evidence surrounding Stats' AOL site for their laches defense. (*Id.* at 508.)

Accordingly, my determination of liability is based solely on defendants' conduct as it relates

fringement under the Copyright Act of 1976, 17 U.S.C. § 501; commercial misappropriation under New York common law; false advertising and false designations of origin under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); and a violation of the Communications Act of 1934, 47 U.S.C. § 605.

124. Defendants, in addition to their claim-specific defenses, allege two global defenses to NBA's assertions which I will address at the outset.

## I. *Laches Defense*

■ 125. First, defendants assert that the doctrine of laches bars NBA's injunctive and monetary recovery because of NBA's delay in bringing the instant action. I find this affirmative defense to be without merit.

126. "Laches is an equitable defense which bars injunctive relief where a plaintiff unreasonably delays in commencing an action." *Tri–Star Pictures, Inc. v. Leisure Time Prods.*, 17 F.3d 38, 44 (2d Cir.1994), *cert. denied*, — U.S. ——, 115 S.Ct. 484, 130 L.Ed.2d 396 (1994).

127. "It is often said that 'mere delay' will not, by itself, bar a plaintiff's suit, but that there must be some element of estoppel, such as reliance by the defendant." *Saratoga Vichy Spring Co., Inc. v. Lehman*, 625 F.2d 1037, 1040 (2d Cir.1980).

■ 128. Accordingly, to succeed under a laches defense, a defendant must prove: (1) the plaintiff had knowledge of the conduct about which it now complains; (2) the plaintiff inexcusably delayed in taking the instant legal action; and (3) the defendant will be prejudiced by permitting the plaintiff to assert its rights in the instant action. *Id.; Tri–Star Pictures*, 17 F.3d at 44.

129. This determination "necessarily requires that the resolution be based on the circumstances peculiar to each case," and it is one which "is entirely within the discretion

of the trial court." *Tri–Star Pictures*, 17 F.3d at 44.

130. Assuming that the other requirements of a laches defense are satisfied, I find that NBA has not inexcusably delayed in filing and prosecuting this action.

131. Although the record does not reveal precisely when NBA and Motorola stopped negotiating, it does reveal that their negotiations continued at least until early 1995 and that Motorola never communicated to NBA its decision to proceed with SportsTrax with or without NBA's involvement. Further, NBA was involved in negotiations with Stats until January 1996; SportsTrax did not begin selling in the retail market until January 1996; NBA mailed Motorola a cease and desist letter in January 1996; and NBA filed this action, requesting expedited relief, on March 5, 1996.

132. Accordingly, I exercise my discretion to reject defendants' laches defense.

## II. *Prior Restraint Defense*

■ 133. Second, defendants make a sweeping First Amendment argument to avoid the injunctive relief sought by NBA. Defendants contend that the First Amendment to the United States Constitution prohibits this Court from enjoining their dissemination of real-time information about NBA games because such an injunction would constitute an unconstitutional prior restraint. I disagree.

134. "There is no doubt that entertainment, as well as news, enjoys First Amendment protection. It is also true that entertainment can itself be important news." *Zacchini v. Scripps–Howard Broadcasting Co.*, 433 U.S. 562, 578, 97 S.Ct. 2849, 2859, 53 L.Ed.2d 965 (1977).

135. Nevertheless, as the Supreme Court recently held in rejecting a prior restraint argument by antiabortion protestors:

to SportsTrax. I will not speculate as to the legality of other conduct by defendants (particularly in light of the fact-intensive inquiry involved in a commercial misappropriation claim) about which so little proof was presented. This is not to say that Stats' AOL site will not be affected by

the nature of the injunctive relief granted pursuant to these Findings of Fact and Conclusions of Law. This issue, however, will await the parties' submissions of proposed forms of judgment for permanent injunctive relief and my determination thereof.

We also decline to adopt the prior restraint analysis urged by petitioners. Prior restraints do often take the form of injunctions. *See, e.g., New York Times Co. v. United States,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (refusing to enjoin publications of the "Pentagon Papers"); *Vance v. Universal Amusement Co.,* 445 U.S. 308, 100 S.Ct. 1156, 63 L.Ed.2d 413 (1980) (per curiam) (holding that Texas public nuisance statute which authorized state judges, on the basis of a showing that a theater had exhibited obscene films in the past, to enjoin its future exhibition of films not yet found to be obscene was unconstitutional as authorizing an invalid prior restraint.) Not all injunctions which may incidentally affect expression, however, are "prior restraints" in the sense that that term was used in *New York Times Co., supra,* or *Vance, supra.* Here petitioners are not prevented from expressing their message in any one of several different ways; they are simply prohibited from expressing it within the 36–foot buffer zone. Moreover, the injunction was issued not because of the content of petitioners' expression, as was the case in *New York Times Co.* and *Vance,* but because of their prior unlawful conduct. *Madsen v. Women's Health Ctr., Inc.,* —— U.S. ——, —— n. 2, 114 S.Ct. 2516, 2524 n. 2, 129 L.Ed.2d 593 (1994).

136. The Court in *Madsen,* in other words, highlighted the distinction between injunctions which constitute merely literal prior restraints (in that they have incidental prospective effects on protected speech or conduct) and those which constitute unconstitutional prior restraints.

■ 137. This distinction, as the Court's discussion indicates, requires two assessments: if such an injunction (1) has a content-neutral justification, and (2) does not represent an absolute bar on a particular expression, then it is not an unconstitutional prior restraint. *Pro–Choice Network v. Schenck,* 67 F.3d 359, 368 n. 5 (2d Cir.1994) (interpreting *Madsen* ), *vacated in part on*

other grounds, 67 F.3d 377 (2d Cir.1995) (en banc), *cert. granted,* —— U.S. ——, 116 S.Ct. 1260, 134 L.Ed.2d 209 (1996).

138. As for content-neutrality, courts repeatedly have distinguished between injunctions which serve to suppress particular ideas and those which provide a remedy for violations of content-neutral laws. *See, e.g., Organization for a Better Austin v. Keefe,* 402 U.S. 415, 418–19, 91 S.Ct. 1575, 1577, 29 L.Ed.2d 1 (1971) (finding an unconstitutional prior restraint because, as in *Near v. Minnesota,* 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931), the seminal prior restraint case, "the injunction operates, not to redress alleged private wrongs, but to suppress, on the basis of previous publications, distributions of literature 'of any kind' in a city of 18,000"); *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 206 (2d Cir. 1979) (recognizing, to reject a prior restraint argument, that "[t]his is not a case of government censorship, but a private plaintiff's attempt to protect its property rights," and that "[t]he prohibition of the Lanham Act is content neutral ... and therefore does not arouse the fears that trigger the application of constitutional 'prior restraint' principles").

139. In this action, as will be discussed below, defendants have commercially misappropriated NBA's proprietary rights in violation of New York's content-neutral common law. It is this remedial purpose, and only this purpose, which justifies the injunctive relief provided herein.

140. The injunction, therefore, is content-neutral and the fact that defendants' unlawful conduct happens to confine itself to a particular topic—NBA games—does not alter this reality.

141. Further, defendants are not totally thwarted in their efforts to profit on the presentation of information about NBA games. I hold only that they cannot do so in the unlawful manner which they presently have chosen—providing their continuous and contemporaneous updates of ongoing NBA games without compensating NBA for its skill, labor, and expenditures.[17] *See Zacchi-*

---

**17.** I also note that an injunction prohibiting defendants' commercial misappropriation would

not strip the public of access to information about NBA games; common experience tells us

*ni*, 433 U.S. at 578, 97 S.Ct. at 2859 ("Petitioner does not seek to enjoin the broadcast of his performance; he simply wants to be paid for it.").

142. Accordingly, defendants' prior restraint argument is unavailing. *Cf. San Francisco Arts & Athletics, Inc. v. Olympic Comm.*, 483 U.S. 522, 541, 107 S.Ct. 2971, 2983, 97 L.Ed.2d 427 (1987) ("The mere fact that the [plaintiff] claims an expressive, as opposed to a purely commercial, purpose does not give it a First Amendment right to 'appropriat[e] to itself the harvest of those who have sown.'") (quoting *International News Serv. v. Associated Press*, 248 U.S. 215, 239–40, 39 S.Ct. 68, 72–73, 63 L.Ed. 211 (1918)); *Zacchini*, 433 U.S. at 575, 97 S.Ct. at 2857 (holding that the First Amendment does not "privilege respondent [broadcasting company] . . . to film and broadcast a prize fight . . . or a baseball game . . . where the promoters or the participants had other plans for publicizing the event") (citing, *inter alia*, *Pittsburgh Athletic Co. v. KQV Broadcasting Co.*, 24 F.Supp. 490 (W.D.Pa.1938)).

## III. *Copyright Infringement Claim*

143. As for NBA's claims, it alleges initially that defendants infringed its copyrights in both the NBA games and the broadcasts of the games in violation of the Copyright Act of 1976 (the "Copyright Act"), 17 U.S.C. § 501.

144. "To establish copyright infringement, 'two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'" *Williams v. Crichton*, 84 F.3d 581, 587 (2d Cir.1996) (quoting *Feist Publications, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 361, 111 S.Ct. 1282, 1296, 113 L.Ed.2d 358 (1991)).

145. I hold that NBA has failed to satisfy the first element for its allegation of infringement of its copyright in the NBA games and has failed to satisfy the second element for its allegation of infringement of its copyright in the broadcasts of NBA games.

### A. *NBA Game Is Not Protected*

█ 146. With respect to the NBA games, NBA is not seeking to protect a written book of NBA rules or coaches' plays or a tangible recording of an NBA game. Instead, it seeks to protect the NBA games themselves—the culmination of interaction of these NBA rules and coaches' plays, the referees, the players, and perhaps even the announcers, members of the press, vendors, patrons, security guards, ticket takers, and the like who are present at the arena during an NBA game and whose interaction comprises an NBA game.

147. I hold, however, that NBA games do not constitute "original works of authorship" and thus do not fall within the subject matter of copyright protection under 17 U.S.C. §§ 102, 103.

148. "The source of Congress' power to enact copyright laws is Article I, § 8, cl. 8, of the Constitution. . . ." *Feist*, 499 U.S. at 346, 111 S.Ct. at 1288.

149. According to this provision, "Congress shall have Power . . . To promote the Progress of Science and useful Arts, by securing for limited Times to Authors . . . the exclusive Right to their respective Writings." U.S. Const. art. I, § 8, cl. 8.

150. As indicated by the language of the Copyright Clause, "[t]he primary objective of copyright is not to reward the labor of authors, but '[t]o promote the Progress of Science and useful Arts.'" *Feist*, 499 U.S. at 349, 111 S.Ct. at 1290 (quoting U.S. Const. art. I, § 8, cl. 8)).

151. Reward to the author is regarded as a secondary consideration necessary only because it "afford[s] greater encouragement to the production of works of benefit to the public." *Zacchini*, 433 U.S. at 577, 97 S.Ct. at 2858; *accord Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 546, 105

that prior to the entry of SportsTrax on the market in January 1996, professional basketball fans had no shortage of sources from which they could acquire information about NBA games, both during and after the games. In fact, defen-

dants made a point of emphasizing during the Hearing that, not including SportsTrax, fans have at least six or seven ways to follow an ongoing NBA game. (Desser, Tr. at 114, 199–202.)

S.Ct. 2218, 2223, 85 L.Ed.2d 588 (1985) (" 'The monopoly created by copyright thus rewards the individual author in order to benefit the public.' ") (citation omitted).

152. Thus,

[t]he economic philosophy behind the clause empowering Congress to grant ... copyrights is the conviction that encouragement of individual effort by personal gain is the best way to advance public welfare through the talents of authors ... in "Science and useful Arts." Sacrificial days devoted to such creative activities deserve rewards commensurate with the services rendered.

*Mazer v. Stein*, 347 U.S. 201, 219, 74 S.Ct. 460, 471, 98 L.Ed. 630 *reh'g denied*, 347 U.S. 949, 74 S.Ct. 637, 98 L.Ed. 1096 (1954).

153. "To this end, copyright assures authors the right to their original work, but encourages others to build freely upon their ideas and information conveyed by a work." *Feist*, 499 U.S. at 349–50, 111 S.Ct. at 1290; *see Harper & Row*, 471 U.S. at 545–46, 105 S.Ct. at 2223 (discussing the need to "assure contributors to the store of knowledge a fair return for their labors," on the one hand, and the need to avoid "imped[ing] the harvest of knowledge" available for public use, on the other hand).

154. The United States Court of Appeals for the Eleventh Circuit has discussed these bedrock policies in terms of the proprietary and regulatory aspects of copyright protection. *Cable News Network, Inc. v. Video Monitoring Servs. of Am., Inc.*, 940 F.2d 1471, 1478 (11th Cir.), *vacated on other grounds*, 949 F.2d 378 (11th Cir.1991), *appeal dismissed*, 959 F.2d 188 (11th Cir.1992).

"Copyright's basis as a proprietary concept is that it enables one to protect his or her own creations. Its regulatory basis is that when these creations constitute the expression of ideas presented to the public, they become part of the stream of information whose unimpeded flow is critical to a free society."

*Id.* (quoting Patterson, *Free Speech, Copyright, and Fair Use*, 40 Vand.L.Rev. 1, 5 (1987)).

155. The primary method by which copyright law seeks to promote these bedrock policies is through a principle known as the "idea/expression or fact/expression dichotomy." *Feist*, 499 U.S. at 350, 111 S.Ct. at 1290.

156. According to this principle, "[t]he most fundamental axiom of copyright law is that '[n]o author may copyright his ideas or the facts he narrates.' " *Id.* at 344–45, 111 S.Ct. at 1287 (quoting *Harper & Row*, 471 U.S. at 556, 105 S.Ct. at 2228).

157. Instead, the "copyright is limited to those aspects of the work—termed 'expression'—that display the stamp of the author's originality." *Harper & Row*, 471 U.S. at 547, 105 S.Ct. at 2224; *see Arica Inst., Inc. v. Palmer*, 970 F.2d 1067, 1074 (2d Cir.1992) ("There is a world of difference between the creative expression of an idea or a fact and its revelation.").

158. The requirement of an original expression "is the very 'premise of copyright law.' " *Feist*, 499 U.S. at 347, 111 S.Ct. at 1288 (citation omitted). Not only is it required by the Copyright Act, but it is "a constitutional requirement." *Id.* at 346, 111 S.Ct. at 1288.

159. Originality, in turn, is comprised of two components: (1) the work must be created independently, as opposed to being copied from another work; and (2) the work must possess some minimal degree of creativity. *Id.* at 345, 111 S.Ct. at 1287.

160. Originality, however, does not require novelty.

[A] work may be original even though it closely resembles other works so long as the similarity is fortuitous, not the result of copying. To illustrate, assume that two poets, each ignorant of the other, compose identical poems. Neither work is novel, yet both are original and, hence, copyrightable.

*Id.* at 345–46, 111 S.Ct. at 1287–88.

161. Facts are not protectible because they lack originality. "The first person to find and report a particular fact has not created the fact; he or she has merely

discovered its existence." *Id.* at 347, 111 S.Ct. at 1288.

> Census takers, for example, do not "create" the population figures that emerge from their efforts; in a sense, they copy these figures from the world around them.... Census data therefore do not trigger copyright because these data are not "original" in the constitutional sense.... The same is true of all facts—scientific, historical, biographical, and news of the day. "They may not be copyrighted and are part of the public domain available to every person."

*Id.* at 347–48, 111 S.Ct. at 1288–89 (citations omitted).

■ 162. Ideas, although they may possess some degree of originality, are not protectible because they are not *expressions* of originality. *See Feist,* 499 U.S. at 345, 111 S.Ct. at 1287 (" '[N]o author may copyright his ideas....' ") (citation omitted). This distinction between an idea and an expression of an idea is necessary to further the primary goal underlying copyright protection: "to increase and not to impede the harvest of knowledge" available to the public. *Harper & Row,* 471 U.S. at 545, 105 S.Ct. at 2223.

163. Section 102(b) of the Copyright Act embodies the idea/expression or fact/expression dichotomy. *See Feist,* 499 U.S. at 356, 111 S.Ct. at 1293 ("[Section] 102(b) is universally understood to prohibit any copyright in facts."); *Warner Bros. Inc. v. American Broadcasting Cos., Inc.,* 720 F.2d 231, 240 (2d Cir.1983) ("The idea-expression dichotomy originated in the case law and is now codified in the statute, 17 U.S.C. § 102(b)....").

164. It provides: "In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work." 17 U.S.C. § 102(b).

165. Application of the idea/expression or fact/expression dichotomy to a particular situation is more of an art than a science.

Nevertheless, as the Court of Appeals has recognized,

> [t]he idea/expression dichotomy, although an imprecise tool, has not been abandoned because we have as yet discovered no better way to reconcile the two competing societal interests that provide the rationale for the granting of and the restrictions on copyright protection: "rewarding an individual's ingenuity and effort while at the same time permitting the nation to benefit from further improvements or progress resulting from others' use of the same subject matter."

*Durham Indus., Inc. v. Tomy Corp.,* 630 F.2d 905, 912 (2d Cir.1980) (quoting *Reyher v. Children's Television Workshop,* 533 F.2d 87, 90 (2d Cir.), *cert. denied,* 429 U.S. 980, 97 S.Ct. 492, 50 L.Ed.2d 588 (1976)); *see Computer Assocs. Int'l, Inc. v. Altai, Inc.,* 982 F.2d 693, 696 (2d Cir.1992) (referring to this balancing of interests as "a delicate equilibrium").

166. In furtherance of these ends, Congress has specified that copyright protection extends only to "original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." 17 U.S.C. § 102(a).

167. Although "[t]he printing of a book [is] the traditional focus of copyright protection," *Cable News Network,* 940 F.2d at 1478; *accord Sony Corp. of Am. v. Universal City Studios, Inc.,* 464 U.S. 417, 430, 104 S.Ct. 774, 783, 78 L.Ed.2d 574 ("Indeed, it was the invention of a new form of copying equipment—the printing press—that gave rise to the original need for copyright protection."), *reh'g denied,* 465 U.S. 1112, 104 S.Ct. 1619, 80 L.Ed.2d 148 (1984), the Copyright Act reflects the history of "gradual expansion in the types of works accorded protection," H.Rep. No. 94–1476, 94th Cong., 2d Sess. (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5664 [hereinafter "H.Rep. No. 94–1476, U.S.C.C.A.N. at ——" or "House Report No. 94–1476"].

168. It states that "[w]orks of authorship include the following categories: (1) lit-

erary works; (2) musical works, including any accompanying words; (3) dramatic works, including any accompanying music; (4) pantomimes and choreographic works; (5) pictorial, graphic, and sculptural works; (6) motion pictures and other audiovisual works; (7) sound recordings; and (8) architectural works." 17 U.S.C. § 102(a).

169. Noticeably absent from this illustrative list of works of authorship, however, is a category for sports events or other analogous organized events.

170. Nevertheless, NBA relies on *Baltimore Orioles, Inc. v. Major League Baseball Player's Ass'n,* 805 F.2d 663 (7th Cir.1986), *cert. denied,* 480 U.S. 941, 107 S.Ct. 1593, 94 L.Ed.2d 782 (1987), to argue, in essence, that NBA games—as opposed to broadcasts or other audiovisual recordings of the games—constitute a ninth category of protectible works of authorship.

171. In that case, the United States Court of Appeals for the Seventh Circuit addressed the issue of "whether major league baseball clubs own exclusive rights to the televised performances of major league baseball players during major league baseball games." *Id.* at 665.

172. The baseball clubs sought a declaratory judgment that the telecasts of the games constituted copyrighted works made for hire in which the baseball players had no rights whatsoever. *Id.* at 667.

173. "The Players argue[d] that the district court erred in holding that a baseball player's live performance, as embodied in a copyrighted telecast of the game, constitutes a work made for hire so as to extinguish the player's right of publicity in his performance." *Id.*

174. The Court, after applying the work-for-hire doctrine in 17 U.S.C. § 201(b),[18] held that the baseball clubs owned the copyright in telecasts of major league baseball games. *Id.* at 673.

175. In this context, the Court included a footnote upon which NBA now relies to argue that the NBA games are protectible. In footnote 7, the Court stated:

The Players argue that their performances are not copyrightable works because they lack sufficient artistic merit. We disagree. Only a modicum of creativity is required for a work to be copyrightable.... Judged by the above standard, the Players' performances possess the modest creativity required for copyrightability.... Courts thus should not gainsay the copyrightability of a work possessing great commercial value simply because the work's aesthetic or educational value is not readily apparent to a person trained in the law. That the Players' performances possess great commercial value indicates that the works embody the modicum of creativity required for copyrightability. Moreover, even if the Players' performances were not sufficiently creative, the Players agree that the cameramen and director contribute creative labor to the telecasts. The work that is the subject of copyright is not merely the Players' performances, but rather the telecast of the Players' performances. The creative contribution of the cameramen and director alone suffices for the telecasts to be copyrightable.

*Id.* at 669 n. 7.

176. I am not persuaded by NBA's reliance on *Baltimore Orioles.*

177. The focus of *Baltimore Orioles* was on the work-for-hire doctrine in 17 U.S.C. § 201(b), not on the issue of whether a sports event, as opposed to its broadcast, is protectible.

178. Further, to the extent that the Court actually addressed this issue, it cites no authority holding that athletic or other organized events fall within the subject matter of copyright protection under 17 U.S.C. §§ 102, 103.

**18.** This provision states:
In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written agreement signed by them, owns all of the rights comprised in the copyright.
17 U.S.C. § 201(b).

179. In fact, *Nimmer on Copyright*, the oft-cited treatise which the Supreme Court recently characterized as the work of a "[l]eading scholar[ ]," *Feist*, 499 U.S. at 347, 111 S.Ct. at 1288, specifically and resoundingly rejects the analysis and conclusion of the Court in *Baltimore Orioles* regarding the protectibility of an athletic event. 1 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 2.09[F] (1996) [hereinafter *Nimmer* ].

180. *Nimmer* points out, *inter alia*, the problematic consequences of according copyright protection to an athletic event, as opposed to its telecast.

181. For example, it is unclear who in addition to NBA would be considered a copyright owner and, therefore, whose consent a party would have to obtain prior to using copyrightable portions of the game. *Id.* § 2.09[F], at 2–169. One might be required to seek the consent of referees, coaches, and all other participants whose creative energies contributed to the NBA game. *See Eastern Microwave, Inc. v. Doubleday Sports, Inc.*, 691 F.2d 125, 128 (2d Cir.1982) (discussing the unworkability of requiring a party "to obtain the consent of or negotiate with numerous copyright owners"), *cert. denied*, 459 U.S. 1226, 103 S.Ct. 1232, 75 L.Ed.2d 467 (1983); *Booth v. Colgate–Palmolive Co.*, 362 F.Supp. 343, 347 (S.D.N.Y.1973) ("[T]he recognition of a performer's right in a copyrighted work would impose undue restraints on the potential market of the copyright proprietor since a prospective licensee would have to gain permission from each of possibly many performers who might have rights in the underlying work before he could safely use it.").

182. Similarly, if a coach copied a play devised by another coach, the second coach might be forced to defend a copyright infringement action if he or she failed to obtain the consent of the first coach. *Nimmer* § 2.09[F], at 2–169.

183. In the end, *Nimmer* concludes that the "more reasonable ... construction [is] that athletic events are subject to legal protection pursuant only to right of publicity, misappropriation, and other established legal doctrines outside the ambit of statutory copyright." *Id.* § 2.09[F], at 2–170.1.

184. In addition to *Nimmer*, case law, although far from bountiful, suggests that organized events are not subject to copyright protection. *See Morrissey v. Procter & Gamble Co.*, 379 F.2d 675, 678 (1st Cir.1967) (characterizing as "unquestionably correct" the proposition that the substance of a promotional sweepstakes contest was not copyrightable); *Production Contractors, Inc. v. WGN Continental Broadcasting Co.*, 622 F.Supp. 1500, 1503 (N.D.Ill.1985) (holding that a "[Christmas] parade, including its production and promotion, is not a work of authorship entitled to copyright protection").

185. Another critique of NBA's reliance on *Baltimore Orioles* is that the Court blurred the very distinction upon which resolution of the issue herein rests. The Court appeared to rely on the creative labor of the cameramen and director in creating the telecast of a baseball game to conclude that the baseball players' performances, in addition to the telecasts of those performances, are protectible works of authorship. *See Baltimore Orioles*, 805 F.2d at 669 n. 7 ("Moreover, even if the Players' performances were not sufficiently creative, the Players agree that the cameramen and director contribute creative labor to the telecasts."). The creative labor of the cameramen and director in broadcasting a game, however, is irrelevant to the issue of the creativity and ultimate protectibility of the game itself.

186. Next, as noted above, the Copyright Act's illustrative list of protectible works of authorship fails to include a category for sports events or other analogous organized events. *See* 17 U.S.C. § 102(a).

187. Although this omission does not necessarily foreclose the possibility of extending copyright protection to an NBA game, *see* 17 U.S.C. § 101 ("The terms 'including' and 'such as' are illustrative and not limitative."), it is probative of the absence of congressional intent to afford copyright protection to such well known events as NBA games, *see United States v. Crane*, 979 F.2d 687, 690 n. 2 (9th Cir.1992) ("The maxim of statutory construction, '*expressio unius est esclusio alterius* ' provides that, '[w]hen a statute limits a thing to be done in a particular mode, it

includes the negative of any other mode.'") (quoting *Botany Worsted Mills v. United States,* 278 U.S. 282, 289, 49 S.Ct. 129, 132, 73 L.Ed. 379 (1929)).

188. Another indicator of congressional intent, the legislative history, demonstrates that Congress specifically contemplated the application of the Copyright Act to sports events. According to House Report No. 94–1476,

> [t]he bill seeks to resolve, through the definition of "fixation" in section 101, the status of live broadcasts—sports, news coverage, live performances of music, etc.—that are reaching the public in unfixed form but that are simultaneously being recorded. When a football game is being covered by four television cameras, with a director guiding the activities of the four cameramen and choosing which of their electronic images are sent out to the public and in what order, there is little doubt that what the cameramen and the director are doing constitutes "authorship." The further question to be considered is whether there has been a fixation. If the images and sounds to be broadcast are first ·recorded (on a video tape, film, etc.) and then are transmitted, the recorded work would be considered a "motion picture" subject to statutory protection against unauthorized reproduction. If the program content is transmitted live to the public while being recorded at the same time, the case would be treated the same; the copyright owner would not be forced to rely on common law rather than statutory rights in proceeding against an infringing user of the live broadcast.

H.Rep. No. 94–1476, U.S.C.C.A.N. at 5665.[19]

189. In light of this deliberation over the application of the Copyright Act to sports events, the omission in 17 U.S.C. § 102(a) of an illustrative category affording copyright protection to these or other analogous events becomes an even greater indication that Congress did not intend to include NBA games within the subject matter of copyright protection. *Cf. Sony Corp.,* 464 U.S. at 429, 104

S.Ct. at 782 ("As the text of the Constitution makes plain, it is Congress that has been assigned the task of defining the scope of the limited monopoly that should be granted to authors. . . .").

190. Absent a more clear directive from Congress, the Supreme Court, or the Court of Appeals, I decline NBA's invitation to stretch the Copyright Act's grant of exclusivity to subject matters so far removed and qualitatively different from those at the core of its protection. *See id.* at 431, 104 S.Ct. at 783 (characterizing as "[s]ound policy" "[t]he judiciary's reluctance to expand the protections afforded by the copyright without explicit legislative guidance").

191. Accordingly, I hold that an NBA game does not fall within the subject matter of copyright protection under 17 U.S.C. §§ 102, 103.

### B. *Copyright In Broadcast Is Not Infringed*

■ 192. Similarly, NBA has failed to show an infringement of its copyright in the broadcasts of NBA games. Although it is uncontested that these broadcasts, unlike the NBA games themselves, are subject to copyright protection, *see* 17 U.S.C. § 102(a)(6) ("Works of authorship include ... motion pictures and other audiovisual works. . . ."), NBA has failed to satisfy the second element of a copyright infringement claim—that defendants copied " 'constituent elements of the [broadcast] that are original,'" *Williams,* 84 F.3d at 587 (citation omitted).

193. "In the absence of direct evidence, copying is proven by showing '(a) that the defendant had access to the copyrighted work and (b) the substantial similarity of protectible material in the two works.'" *Id.* (citation omitted). "In the alternative, '[i]f two works are so strikingly similar as to preclude the possibility of independent creation, "copying" may be proved without a showing of access.'" *Lipton v. Nature Co.,* 71 F.3d 464, 471 (2d Cir.1995) (citation omitted).

---

19. This provision "is generally attributed to the National Football League's (NFL) then Commissioner, Pete Rozelle. The NFL was concerned with enforcing its copyright to the *telecast* of live football games." *Cable News Network,* 940 F.2d at 1480 n. 16 (emphasis added).

194. Even if direct evidence exists of copying, a defendant is not liable for infringing a copyright if the defendant copied only unprotectible elements of the copyrighted work. *See Feist,* 499 U.S. at 348, 111 S.Ct. at 1289 ("The mere fact that a work is copyrighted does not mean that every element of the work may be protected."); *Williams,* 84 F.3d at 588 (holding, while applying the two-prong test to assess copying in the absence of direct evidence, that if a court determines "that a work contains both protectible and unprotectible elements, [it] must take care to inquire only whether 'the protectible elements, standing alone, are substantially similar' ") (citation omitted).

195. In the instant case, although direct evidence exists that defendants actually copied certain aspects of the broadcasts of the NBA games,[20] this evidence also reveals that defendants copied, at most, the idea of an NBA game and facts from specific NBA games, both of which are beyond the realm of protectibility, *Feist,* 499 U.S. at 350, 111 S.Ct. at 1290. Defendants did not copy or otherwise capture the original features of the broadcasts of the NBA games which render such broadcasts protectible in the first instance.

196. The Copyright Act's legislative history highlights the rationale for protecting live broadcasts of sports events.

> When a football game is being covered by four television cameras, with a director guiding the activities of the four cameramen and choosing which of their electronic images are sent out to the public and in what order, there is little doubt that what the cameramen and the director are doing constitutes "authorship."

H.Rep. No. 94–1476, U.S.C.C.A.N. at 5665.

197. It is this element of originality, therefore, that renders live broadcasts of sports events amenable to copyright protection. *See Feist,* 499 U.S. at 345, 111 S.Ct. at 1287 ("The *sine qua non* of copyright is originality."); *Baltimore Orioles,* 805 F.2d at 668 ("The many decisions that must be made during the broadcast of a baseball game concerning camera angles, types of shots, the use of instant replays and split screens, and shot selection similarly supply the creativity required for the copyrightability of the telecasts.").

198. The information conveyed by defendants, such as the score, time remaining, team with possession, and quarter, is unaffected by the camera angles, close-ups, and particular shots selected for broadcast.

199. Defendants provide purely factual information which any patron of an NBA game could acquire from the arena without any involvement from the director, cameramen, or others who contribute to the originality of a broadcast. This is not a scenario where defendants reproduced actual excerpts of the broadcasts of NBA games.

200. The mere fact that the information conveyed by defendants often is acquired by viewing the broadcasts of NBA games does not alter the fact that defendants have not copied the " 'constituent elements of the [broadcasts of NBA games] that are original.' " *Williams,* 84 F.3d at 587 (citation omitted); *accord Chamberlin v. Uris Sales Corp.,* 150 F.2d 512, 513 (2d Cir.1945) ("But since the only copying here was of that portion of the subject matter which, standing alone, could not validly be copyrighted, we hold there is no infringement.").

201. NBA, therefore, has failed to satisfy its burden of persuasion on its claim that defendants infringed its copyright in the broadcasts of NBA games.

## IV. *Commercial Misappropriation Claim*

202. NBA also alleges that defendants unlawfully misappropriated NBA's property interests in the NBA games and the broadcasts of NBA games in violation of New York common law.

### A. *Preemption by Copyright Act: NBA Games v. Broadcasts of NBA Games*

203. Defendants' initial defense is that 17 U.S.C. § 301 preempts NBA's com-

---

**20.** It is not disputed that Stats' reporters acquired their information directly from either television or radio broadcasts of NBA games.

mercial misappropriation claim. I agree in part. NBA's misappropriation claim is not preempted as it relates to NBA's proprietary rights in the NBA games; NBA's misappropriation claim is preempted as it relates to NBA's proprietary rights in the broadcasts of NBA games.

204. Section 301 states:

(a) On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the *general scope of copyright as specified by section 106* in works of authorship that are fixed in a tangible medium of expression *and* come within the *subject matter of copyright as specified by sections 102 and 103,* whether created before or after that date and whether published or unpublished, are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

(b) Nothing in this title annuls or limits any rights or remedies under the common law or statutes of any State with respect to—

(1) subject matter that does not come within the *subject matter of copyright as specified by sections 102 and 103,* including works of authorship not fixed in any tangible medium of expression; or

\*   \*   \*   \*   \*   \*

(3) activities violating legal or equitable rights that are not equivalent to any of the exclusive rights within the *general scope of copyright as specified by section 106;*

\*   \*   \*   \*   \*   \*

17 U.S.C. § 301(a), (b)(1), (b)(3) (emphasis added).

205. As is readily apparent from the statutory language, preemption of a state law claim consists largely [21] of two requirements: (1) the state law claim must seek to vindicate rights equivalent to those in 17 U.S.C. § 106

(the "general scope requirement"); and (2) the work to which the state law claim is being applied must be the type of work which falls within the ambit of 17 U.S.C. §§ 102, 103 (the "subject matter requirement"). *See* H.R. No. 94–1476, U.S.C.C.A.N. at 5746 ("The intention of section 301 is to preempt and abolish any rights under the common law or statutes of a State that are equivalent to copyright *and* that extend to works coming within the scope of the Federal copyright law.") (emphasis added).

206. The goal of this provision is to "substitut[e] a single Federal system for the present anachronistic, uncertain, impractical, and highly complicated dual system" of " 'common law copyright' for unpublished works and statutory copyright for published works." *Id.* at 5745.

*1. General Scope Requirement*

207. The general scope requirement necessitates an assessment of the types of rights sought to be protected by the state law.

208. If these rights are "equivalent" to those in 17 U.S.C. § 106, then this requirement of preemption is satisfied. 17 U.S.C. § 301(a).

209. Section 106, entitled "Exclusive rights in copyrighted works," affords a copyright owner the exclusive rights to reproduce the work, prepare derivative works, distribute and display copies of the work, and perform certain copyrighted works publicly. *Id.* § 106.

210. "Section 301 thus preempts only those state law rights that 'may be abridged by an act which, in and of itself, would infringe one of the[se] exclusive rights' provided by federal copyright law." *Computer Associates.,* 982 F.2d at 716 (citation omitted).

211. "But if an 'extra element' is 'required instead of or in addition to the acts of reproduction, performance, distribution or display, in order to constitute a state-created cause of action, then the right does not lie

---

**21.** I recognize that Section 301 imposes other requirements on its preemptive effect. It applies, for example, only to undertakings commenced on or after January 1, 1978, 17 U.S.C. § 301(b)(2), and does not apply to certain actions involving state and local landmarks, historic preservation, zoning, or building codes, *id.* § 301(b)(4). However, none of these requirements is relevant in this action.

1148

"within the general scope of copyright," and there is no preemption.'" *Id.* (quoting *Nimmer* § 1.01[B]).

212. In other words, "[a] state law claim is not preempted if the 'extra element' changes the nature of the action so that it is *qualitatively* different from a copyright infringement claim." *Id.* (citation omitted) (emphasis in original).

213. However, "[a]n action will not be saved from preemption by elements such as awareness or intent, which alter 'the action's scope but not its nature.'" *Id.* at 717 (citation omitted).

214. State law rights which satisfy the extra element test—and thus avoid preemption—"include unfair competition claims based upon breaches of confidential relationships, breaches of fiduciary duties and trade secrets." *Id.*

215. In the trade secret branch of unfair competition law, for example, "[t]he defendant's breach of duty ... supplies the 'extra element' that qualitatively distinguishes such trade secret causes of action from claims for copyright infringement that are based solely upon copying." *Id.*

216. Claims based on the misappropriation branch of unfair competition law suffer a different fate.

217. It is true that these claims do not necessarily fail to satisfy the extra element standard.

For example, state law should have the flexibility to afford a remedy (under traditional principles of equity) against a consistent pattern of unauthorized appropriation by a competitor of the facts (i.e., not the literary expression) constituting "hot" news, whether in the traditional mold of *International News Service v. Associated Press,* 248 U.S. 215 (1918), or in the newer form of updates from scientific, business, or financial data bases.

H.R. No. 94–1476, U.S.C.C.A.N. at 5748 (footnote omitted); *see Financial Info. Inc. v. Moody's Investors Serv., Inc.,* 808 F.2d 204, 208 (2d Cir.1986) (citing this provision to note that a misappropriation claim, although preempted in that case, is not necessarily preempted by the Copyright Act), *cert. de-*

*nied,* 484 U.S. 820, 108 S.Ct. 79, 98 L.Ed.2d 42 (1987). *But see* Edmund W. Kitch & Harvey S. Perlman, *Legal Regulation of the Competitive Process* 470–71 (rev. 4th ed. 1991) (quoting 122 Cong.Rec.H. 10910 (daily ed. Sept. 22, 1976), which reflects the impenetrable exchange between Congressmen Seiberling and Railsback on Congressman Seiberling's proposed amendment, which ultimately was adopted, to remove the examples of non-preempted doctrines from Section 301(b)(3) on the ground that, *inter alia,* including misappropriation as a non-preempted area was anti-competitive).

218. Nevertheless, the Court of Appeals, when confronted with the issue, repeatedly has held common law misappropriation claims to be preempted by the Copyright Act. *See, e.g., Computer Assocs.,* 982 F.2d at 717 ("Following this 'extra element' test, we have held that unfair competition and misappropriation claims grounded solely in the copying of a plaintiff's protected expression are preempted by section 301."); *Princess Fabrics, Inc. v. CHF, Inc.,* 922 F.2d 99, 104 (2d Cir.1990) (holding that a misappropriation claim, as opposed to a claim of "'palming off' of copies by one producer as those of another," is preempted by federal copyright law); *Financial Info.,* 808 F.2d at 208 ("We are not persuaded by [plaintiff's] argument that misappropriation is not 'equivalent' to the exclusive rights provided by the Copyright Act.") (citing *Editorial Photocolor Archives, Inc. v. Granger Collection,* 61 N.Y.2d 517, 474 N.Y.S.2d 964, 967, 463 N.E.2d 365, 368 (1984) ("That plaintiffs have chosen to enforce such rights to reproduce, display, sell, lease or license for reproduction, the transparencies in the form of [a] cause[ ] of action for unfair competition ... does not make the underlying rights sought to be enforced any less equivalent to copyright, or remove plaintiff's claims from the Federal pre-emptive scheme.")); *Walker v. Time Life Films, Inc.,* 784 F.2d 44, 53 (2d Cir.) (affirming the district court's dismissal of an unfair competition claim because "[a]s the New York Supreme Court found in [Walker's] state court action, Walker's cause of action for unfair competition is preempted by the federal copyright laws to the extent it seeks

protection against copyrighting of Walker's book"), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2278, 90 L.Ed.2d 721 (1986); *Warner Bros.,* 720 F.2d at 247 ("[S]tate law claims that rely on the misappropriation branch of unfair competition are preempted...."); *Durham Indus.,* 630 F.2d at 918 (citing 17 U.S.C. § 301 to hold that "Tomy cannot achieve by an unfair competition claim what it failed to achieve under its copyright claim").

219. In the instant action, just as in the cases cited above, NBA seeks to vindicate rights, under the guise of a commercial misappropriation claim, which are "equivalent to ... the exclusive rights within the general scope of copyright as specified by section 106." 17 U.S.C. § 301(a).

220. NBA's misappropriation allegations, as they relate to NBA's rights both in the NBA games and in the broadcasts of NBA games, complain, in effect, of defendants' "'reproduction, ... distribution or display'" of information regarding NBA games. *Computer Assocs.,* 982 F.2d at 716 (citation omitted). Such allegations of copying fail to include the extra element necessary to render NBA's misappropriation claim qualitatively different from its copyright claim.

221. Accordingly, the general scope requirement is satisfied for NBA's misappropriation claim as it relates to both the NBA games and the broadcasts of NBA games.

### 2. *Subject Matter Requirement*

222. The next requirement—the subject matter requirement—mandates a determination of whether the type of work at issue falls within the "subject matter of copyright as specified by sections 102 and 103." 17 U.S.C. § 301(a).

223. Section 102, entitled "Subject matter of copyright: In general," and Section 103, entitled "Subject matter of copyright: Compilations and derivative works," articulate the types of works which may give rise to the exclusive rights protected by the Copyright Act.

224. As a "motion picture[ ] or other audiovisual work[ ]," *id.,* the broadcasts of NBA games fall within the "subject matter of copyright as specified by section[ ] 102," *id.* § 301(a).

225. Consequently, NBA's misappropriation claim is preempted to the extent that it relies on misappropriation of property rights in the broadcasts of NBA games.

226. As for the NBA games themselves, however, they do not satisfy the subject matter requirement and, accordingly, NBA's misappropriation claim, as it relates to the NBA games, is not preempted by 17 U.S.C. § 301.

227. Unlike the NBA games herein, the works at issue in the cases discussed above, which found preemption of misappropriation claims, satisfied the subject matter requirement. *See Princess Fabrics,* 922 F.2d at 100 (addressing a textile company's fabric lace design which had received a certificate of copyright); *Financial Info.,* 808 F.2d at 205 (addressing a financial publisher's index card service which provided various information to subscribers about municipal bonds); *Editorial Photocolor Archives,* 474 N.Y.S.2d at 967, 463 N.E.2d at 368 ("It is not disputed that the transparencies and photographs at issue are within the subject matter of copyright...."); *Walker,* 784 F.2d at 46 (addressing the book "Fort Apache"); *Warner Bros.,* 720 F.2d at 235 (addressing the "fictional character Superman, the hero of comic books, television, and more recently films"); *Durham Indus.,* 630 F.2d at 908 (addressing a toy manufacturer's dolls and other toys).

228. This is not to say that all of the works ultimately were accorded copyright protection, but merely that they were the types of works which could have been accorded such protection but for their insufficient originality, the plaintiff's failure to comply with the technical requirements of the Copyright Act, or the plaintiff's failure to show that defendants copied the work. *See, e.g., Princess Fabrics,* 922 F.2d at 101 (affirming a district court's holding that a copyright was invalidated due to a failure to affix notice of the copyright to the copyrighted fabric design); *Financial Info.,* 808 F.2d at 208 (affirming the district court's finding that the financial index cards lacked sufficient independent creation to merit copyright protection); *Walker,* 784 F.2d at 46 ("We conclude

that no reasonable observer could find substantial similarity between the protectible elements of plaintiff's book and defendant's movie...."); *Warner Bros.*, 720 F.2d at 245 (affirming a district court's judgment in favor of the defendants on the copyright claim because no reasonable jury could find that the parties' works were substantially similar); *Durham Indus.*, 630 F.2d at 919 n. 15 (holding that the works of the purported copyright owner "lack sufficient originality to qualify for protection under the Copyright Act").

229. As discussed above, however, my holding that the NBA games are not subject to the Copyright Act's grant of exclusivity is not based merely on the lack of originality of particular NBA games, the failure of NBA to comply with the technical requirements of the Copyright Act, such as the notice requirements in 17 U.S.C. § 401, or the failure of NBA to show that defendants copied protected aspects of the NBA games. Instead, I hold categorically that the NBA games, unlike broadcasts of NBA games, do not fall within the ambit of protected subject matters under 17 U.S.C. §§ 102, 103.

230. Thus, NBA's claim of misappropriation of its rights in the NBA games fails to satisfy the subject matter test of 17 U.S.C. § 301 and, therefore, is not preempted.[22]

## B. *Defendants' Misappropriation*

■ 231. Turning to the merits of NBA's misappropriation claim, I find that

22. Although not raised by the parties, I am aware that this holding raises an issue of the seemingly inherent partial preemption which will occur in cases, such as this one, where a defendant relies on a broadcast to engage in misappropriation.

This issue exists because it is difficult to conceive of a scenario when misappropriation of rights in the broadcast (which is preempted) does not also involve misappropriation of rights in the underlying event (which is not preempted). After all, the skill, expenditures, and labor involved in the broadcast would seem to constitute nothing more than an inseparable supplement to the skill, expenditure, and labor involved in the game itself, for the broadcast would not exist but for the skill, expenditure, and labor used to create the game. Thus, misappropriation of one subsumes misappropriation of the other, yet only that part relating to the broadcast would be preempted.

NBA has satisfied its burden of proof that defendants have engaged in unfair competition in violation of New York common law through their commercial misappropriation of NBA's proprietary interests in the NBA games.

## 232. The law of unfair competition

originated in the conscience, justice and equity of common-law judges. It developed within a framework of a society dedicated to freest competition, to deal with business malpractices offensive to the ethics of that society. The theoretical basis is obscure, but the birth and growth of this branch of law is clear. It is an outstanding example of the law's capacity for growth in response to the ethical as well as the economic needs of society. As a result of this background the legal concept of unfair competition has evolved as a broad and flexible doctrine with a capacity for further growth to meet changing conditions. There is no complete list of the activities which constitute unfair competition....

The statement of a sufficient cause of action in unfair competition, in the last analysis, is therefore dependent more upon the facts set forth and less upon technical requirements than in most causes of action.

*Metropolitan Opera Ass'n, Inc. v. Wagner–Nichols Recorder Corp.*, 199 Misc. 786, 101 N.Y.S.2d 483, 488–89 (Sup.Ct.N.Y.Co.1950),

As a result of this partial preemption, it is possible for a plaintiff to assert claims both for infringement of its copyright in a broadcast and misappropriation of its rights in the underlying event.

Nevertheless, I find that this situation of partial preemption and concurrent copyright and misappropriation claims is simply an inevitable consequence of adhering to the very distinctions which the Copyright Act requires that I make. To avoid this effect, I would be required to hold that NBA games, as opposed to their telecasts, fall within the subject matter of copyright protection, thus resulting in total preemption of a misappropriation claim. I do not interpret the Copyright Act, however, as sanctioning this result. Therefore, the clear terms of the Copyright Act's preemption provision mandate that misappropriation claims relating to NBA games, as opposed to those relating to their broadcasts, are not preempted.

*aff'd mem.*, 279 A.D. 632, 107 N.Y.S.2d 795 (1st Dep't 1951).

233. "The early cases of unfair competition in which relief was granted were cases involving 'palming off'—that is, the fraudulent representation of the goods of the seller as those of another." *Id.* at 489.

234. Palming off was actionable because of the "two wrongs inflicted thereby: (1) The deceit and fraud on the public; and (2) the misappropriation to one person of the benefit of a name, reputation or business good will belonging to another." *Id.*

235. Subsequently, the courts of New York extended the doctrine of unfair competition beyond cases of palming off to grant relief "in cases where there was no fraud on the public, but only a misappropriation for the commercial advantage of one person of a benefit or 'property right' belonging to another." *Id.*

236. In *Roy Export Co. Establishment of Vaduz v. Columbia Broadcasting Sys., Inc.*, 672 F.2d 1095 (2d Cir.), *cert. denied*, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982), the Court of Appeals discussed this extension of the law of unfair competition:

> The misappropriation branch of the unfair competition tort traces its lineage to the Supreme Court's decision in *International News Service v. Associated Press*, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918), upholding a decision enjoining INS from copying AP's news bulletins, which AP had compiled at considerable effort and expense, and then selling the pirated information in competition with AP. With the subsequent decline of general federal common law, the doctrine was developed by the states, New York in particular; there it has flourished in a variety of factual settings, ... despite some early efforts by this Court to limit the doctrine to the narrow circumstances of the *INS* case,....[23]

An unfair competition claim involving misappropriation usually concerns the taking and use of the plaintiff's property to compete against plaintiff's own use of the same property.... By contrast, in this case the Compilation was taken and used to compete unfairly against a different property.... Despite the unusual facts, we are satisfied that the plaintiffs have established an unfair competition tort under New York law.

New York courts have noted the "incalculable variety" of illegal practices falling within the unfair competition rubric, ... calling it a "broad and flexible doctrine" that depends "more upon the facts set forth ... than in most causes of action".... It has been broadly described as encompassing "any form of commercial immorality," ... or simply as "endeavoring to reap where [one] has not sown" ...; it is taking "the skill, expenditures and labors of a competitor," ... and "misappropriati[ng] for the commercial advantage of one person ... a benefit or 'property' right belonging to another".... The tort is adaptable and capacious.

*Roy Export*, 672 F.2d at 1105 (citations omitted); *see Greenblatt v. Prescription Plan*

---

**23.** AOL cites *Werlin v. Reader's Digest Ass'n, Inc.*, 528 F.Supp. 451 (S.D.N.Y.1981) to argue that "New York has gone a step beyond limiting *INS* to its facts; bad faith is required as well." (AOL Memo. at 11.) The Court in *Werlin*, while rejecting the plaintiff's contention that defendant Reader's Digest misappropriated the plaintiff's idea for an article, held that New York's doctrine of commercial misappropriation requires, *inter alia*, "that the defendant obtained access to the idea through an abuse of a fiduciary or confidential relationship with the plaintiff or via some sort of fraud or deception." *Id.* at 464.

I do not find AOL's reliance on *Werlin* to be persuasive. First, misappropriation claims inherently require fact-specific inquiries, *see Metropolitan Opera*, 101 N.Y.S.2d at 489 (recognizing that unfair competition claims depend more on the facts than upon technical requirements), and that case addressed completely different facts from those at issue here. Second, to the extent that the Court in *Werlin* rendered a broadly applicable interpretation of commercial misappropriation, I disagree that fiduciary relationships, fraud, and deception are integral to all commercial misappropriation claims. *E.g., National Exhibition Co. v. Fass*, 143 N.Y.S.2d 767 (Sup.Ct. N.Y.Co.1955) (discussed *infra*); *see Metropolitan Opera*, 101 N.Y.S.2d at 492 ("The New York courts have applied the rule in the *International News Service* case in such a wide variety of circumstances as to leave no doubt of their recognition that the effort to profit from the labor, skill, expenditures, name and reputation of others which appears in this case constitutes unfair competition which will be enjoined.").

*Servs. Corp.,* 783 F.Supp. 814, 825 (S.D.N.Y. 1992) (holding that the "essence of the tort is the effort to misappropriate the fruits of another's efforts").

237. The breadth of the commercial misappropriation doctrine is evidenced by the absence of a requirement "of actual competition between the parties." *Metropolitan Opera,* 101 N.Y.S.2d at 491–92. Instead,

[t]he modern view as to the law of unfair competition does not rest solely on the ground of direct competitive injury, but on the broader principle that property rights of commercial value are to be and will be protected from any form of commercial immorality, and a court of equity will penetrate and restrain every guise resorted to by the wrongdoer. The courts have thus recognized that in the complex pattern of modern business relationships, persons in theoretically non-competitive fields may, by unethical business practices, inflict as severe and reprehensible injuries upon others as can direct competitors.

*Id.* at 492; *accord Berni v. International Gourmet Restaurants of Am., Inc.,* 838 F.2d 642, 648 (2d Cir.1988) ("Under New York law, a party need not be a direct competitor to institute an unfair competition action.").

238. Courts have applied these principles to find commercial misappropriation in a wide variety of contexts.

239. One such context is that of the gathering and dissemination of news, both financial and other types of news.

240. In *Board of Trade of the City of Chicago v. Christie Grain & Stock Co.,* 198 U.S. 236, 25 S.Ct. 637, 49 L.Ed. 1031 (1905), the Chicago Board of Trade sought to

enjoin the principal defendants from using and distributing the continuous quotations of prices on sales of grain and provisions for future delivery, which are collected by plaintiff, and which cannot be obtained by the defendants except through a known breach of the confidential terms on which the plaintiff communicates them.

*Id.* at 245, 25 S.Ct. at 637.

241. The Supreme Court held that "plaintiff's collection of quotations is entitled to the protection of the law" and, therefore, the

"plaintiff has the right to keep the work which it has done, or paid for doing, to itself." *Id.* at 250, 25 S.Ct. at 639. Further, according to the Court, the

plaintiff does not lose its rights by communicating the result to persons, even if many, in confidential relations to itself, under a contract not to make it public, and strangers to the trust will be restrained from getting at the knowledge by inducing a breach of trust, and using knowledge obtained by such a breach.

\*   \*   \*   \*   \*   \*

... Time is of the essence in matters like this, and it fairly may be said that, if the contracts with the plaintiff are kept, the information will not become public property until the plaintiff has gained its reward.

*Id.* at 250–51, 25 S.Ct. at 640. The Court concluded that an injunction restraining the defendant's conduct was appropriate. *Id.* at 253, 25 S.Ct. at 640; *see Board of Trade of City of Chicago v. Tucker,* 221 F. 305, 306–07 (2d Cir.1915) (relying on *Christie Grain & Stock* to affirm an injunction restraining the defendant's ability to obtain, use, or distribute the plaintiff's continuous price quotations).

242. Next, in *International News Serv. v. Associated Press,* 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918), the Supreme Court addressed a misappropriation claim involving parties who were competitors in the "gathering and distribution of news and its publication for profit in newspapers throughout the United States." *Id.* at 221, 39 S.Ct. at 69.

243. The defendant company acquired news gathered by plaintiff's company by bribing plaintiff's employees and employees of newspapers with subscriptions to the plaintiff's news gathering service, and by copying news from "bulletin boards and from early editions of [plaintiff]'s newspapers." *Id.* at 231, 39 S.Ct. at 70. The defendant then sold this news to its customers in an effort to compete with the plaintiff in providing timely news. *Id.*

244. The Supreme Court, recognizing that the "peculiar value of news is the spreading of it while it is fresh" and that "a

valuable property interest in the news, as news, cannot be maintained by keeping it secret," *id.* at 235, 39 S.Ct. at 71, held that

defendant, by its very act, admits that it is taking material that has been acquired by complainant as the result of organization and the expenditure of labor, skill, and money, and which is salable by complainant for money, and that defendant in appropriating it and selling it as its own is endeavoring to reap where it has not sown, and by disposing of it to newspapers that are competitors of complainant's members is appropriating to itself the harvest of those who have sown. Stripped of all disguises, the process amounts to an unauthorized interference with the normal operation of complainant's legitimate business precisely at the point where the profit is to be reaped, in order to divert a material portion of the profit from those who have earned it to those who have not; with special advantage to defendant in the competition because of the fact that it is not burdened with any part of the expense of gathering the news. The transaction speaks for itself and a court of equity ought not to hesitate long in characterizing it as unfair competition in business.

*Id.* at 239–40, 39 S.Ct. at 72–73.

245. More recently, the Appellate Division, First Department, in New York relied on *International News Serv.* to grant a temporary injunction and thereby protect a plaintiff's property interest in the gathering and dissemination of news. *The Bond Buyer v. Dealers Digest Publishing Co., Inc.*, 25 A.D.2d 158, 267 N.Y.S.2d 944, 945–46 (1st Dep't 1966) (per curiam).

246. Both parties produced publications on municipal and other governmental bonds. *Id.* at 159, 267 N.Y.S.2d at 945–46. The plaintiff also operated a teletype service which provided immediate information on bond offerings in advance of either of the parties' publications. *Id.*

247. The defendant

appropriated information gained from plaintiff's wire service, though defendant is not a subscriber, and by this means has been enabled to publish items in its news sheet contemporaneously with plaintiff's

publications in its news sheet, thereby reaping the benefit of plaintiff's news gathering staff without either incurring the expense or expending the effort.

*Id.*

248. Relying on *International News Serv.*, the Court held that "[t]o make a commercial use of the result of the labor is, as the court said, to reap where one has not sown. In legal phraseology, it is a form of unfair competition." *Id.* at 160, 267 N.Y.S.2d at 946.

249. In addition to the news gathering and dissemination context, courts repeatedly have protected, through the doctrine of commercial misappropriation, the property rights of those who invest the time and money into the creation of sports events and their broadcasts by limiting the permissible uses which others may make of information regarding ongoing sports events.

250. In *Pittsburgh Athletic Co. v. KQV Broadcasting Co.*, 24 F.Supp. 490 (W.D.Pa. 1938), *cited by Metropolitan Opera*, 101 N.Y.S.2d at 497, the plaintiffs sought a preliminary injunction to "restrain defendant from broadcasting play-by-play reports and descriptions of baseball games played by the 'Pirates,'" a professional baseball team owned by the plaintiffs. *Id.* at 491.

251. The defendant operated a radio broadcasting station from which it broadcast play-by-play descriptions of the games played by the Pirates. *Id.* at 492. It acquired its information about the games "from its own paid observers whom it stations at vantage points outside [the baseball park] on premises leased by the defendant. These vantage points are so located that the defendant's observers can see over the enclosures the games as they are played." *Id.* Just as in the present case, the paid observers had no contractual relationship with the plaintiff.

252. The defendant sought by its broadcast "to cultivate the good will of the public for its radio station," but it did not derive revenue directly from the broadcast. *Id.* at 493.

253. The plaintiffs required payment of an admission fee to view the game from

within the ballpark and the admission ticket contained a clause preventing the ticketholder from giving out any news of the game while it is in progress. *Id.* at 492. Further, the plaintiffs licensed the exclusive broadcast rights to the baseball games, and they, "at great expense, acquired and maintain[ed] a baseball park, [and] pa[id] the players who participate[d] in the game." *Id.*

254. The Court held that the plaintiffs, "by reason of [their] creation of the game, [their] control of the park, and [their] restriction of the dissemination of news therefrom, [have] a property right in such news, and the right to control the use thereof for a reasonable time following games." *Id.*

255. Further, "the communication of the news by the plaintiff, or by [their] licensed news agencies, is not a general publication and does not destroy that right." *Id.*

256. The defendant's conduct, however, interfered with this right by depriving "the plaintiffs and each of them of the just benefits of their labors and expenditures in respect of baseball games and the public dissemination of news thereof," *id.* at 494, and amounted to "unfair competition," *id.* at 492.

257. In *Twentieth Century Sporting Club, Inc. v. Transradio Press Serv., Inc.,* 165 Misc. 71, 300 N.Y.S. 159 (Sup.Ct.N.Y.Co. 1937), promoters of a boxing exhibition sued a press service engaged in the business of supplying news to certain broadcasting stations.

258. The promoters granted the exclusive radio broadcast rights to National Broadcasting Company for the ringside round-by-round description of the fight. *Id.* at 160. The press service, aware of this grant of exclusive broadcast rights, notified its radio broadcasting station customers that Transradio would provide a running account of the fight while it is in progress, covering each round "as rapidly as it is mechanically possible." *Id.*

259. The press service intended to " 'obtain tips from the ringside broadcast as to the facts of the progress of the fight, and to authenticate them by independent investigation by news gathering representatives of defendants located at vantage points outside the stadium but within view of the bout.' " *Id.* (quoting defendant's letter).

260. The ultimate goal of the press service's plan was "to rebroadcast the description of the exhibition without waiting for the termination thereof." *Id.* at 161.

261. In granting the promoter's motion for a preliminary injunction, the Court concluded that "[o]bviously such action by defendants would constitute an unlawful appropriation of the exclusive property rights of the plaintiff." *Id.*

262. The Court continued:

By appropriating or utilizing the whole or the substance of the plaintiff's broadcast the defendants would be enabled to derive profits from the exhibition without having expended any time, labor, and money for the presentation of such exhibition. It is to be borne in mind that this exhibition will only be possible as a result of an expenditure of considerable time, labor, and money by the plaintiffs. The plaintiffs are entitled to look for recoupment through the grant of exclusive broadcasting privileges. They have taken proper steps to retain these exclusive rights by selling tickets for admission to such exhibition, which tickets contain [an express contract limiting the ticketholder's ability to film or broadcast the exhibition].

\*    \*    \*    \*    \*    \*

[T]he defendant's plan for broadcasting an account of the exhibition will necessarily be based to a substantial degree upon the use of the plaintiffs' broadcast. Under all the circumstances, this court cannot reach any conclusion other than that plan submitted by defendants cannot be utilized without an unlawful appropriation of the substance of the plaintiffs' broadcast.

*Id.*

263. Next, in *Mutual Broadcasting Sys., Inc. v. Muzak Corp.,* 177 Misc. 489, 30 N.Y.S.2d 419 (Sup.Ct.N.Y.Co.1941), the Court confronted a similar attempt to misappropriate another's rights arising from a sports event.

264. The plaintiff, pursuant to written contract, acquired the exclusive right to

broadcast the 1941 World Series Games over radio broadcasting stations throughout the United States, Canada, and Cuba. *Id.* at 419. The defendant sought to use a conventional radio receiver to receive plaintiff's broadcast and then to transmit the sound through telephone lines to the defendant's customers. *Id.* at 420. The plaintiff sued the defendant, arguing that the "defendant's act is that of an interloper or parasite." *Id.*

265. In this context, the Court rejected the defendant's argument that it acted properly by not palming off as its own broadcast that which is broadcast by the plaintiff and, instead, granted the plaintiff's motion for a temporary injunction restraining the defendant's conduct. *Id.*

266. After noting that the parties were "competitors or potential competitors" because both were relying on the play-by-play descriptions of the games in order to attract listeners and enhance the profitability of their businesses, *id.* at 419, the Court balanced the rights of the plaintiff with those of the defendant.

267. The plaintiff "expended large sums of money and laborious effort in competition with other broadcasting systems in order to obtain the right to transmit" the World Series. *Id.* at 420. "As a prerequisite it was required to and did obtain a license to broadcast and is subjected to the regulations of public authorities under the Federal Communications Act, 47 U.S.C.A. § 151 et seq." *Id.* Further, the plaintiff "through the expenditure of such money and effort obtained the exclusive right which common sense indicates is of tremendous commercial value," and it "may reasonably be expected that further good will, additional listeners and added profit will result." *Id.*

268. Citing *International News Serv.,* the Court concluded that "it seems clear that plaintiff's right has been invaded by defendant and that plaintiff is entitled to the injunction sought." *Id.*

269. In *National Exhibition Co. v. Fass,* 143 N.Y.S.2d 767 (Sup.Ct.N.Y.Co.1955), a case remarkably similar to this one despite the vast gap in the technologies employed, the Court rejected a defendant's argument

that radio broadcasts of baseball games constitute news in the public domain available to all persons for all purposes and permanently enjoined the defendant's misappropriation of the proprietary rights of a professional baseball team owner.

270. The plaintiff was the owner and operator of "a professional baseball club with a team of professional baseball players known as the 'Giants.'" *Id.* at 769. The defendant was an "independent newsgatherer and professional sports reporter." *Id.*

271. The defendant listened "to broadcasts of play-by-play descriptions of baseball games produced by plaintiff" and sent "out simultaneous teletype reports of the games to radio stations for immediate rebroadcast." *Id.* at 768. These teletype reports usually were relayed "within seconds or minutes," *id.* at 775, and were rebroadcast by the receiving radio stations "on the same day and during the time that plaintiff's game involved was actually in progress," *id.*

272. In granting the permanent injunction, the Court held that

[p]laintiff is the owner of the professional baseball exhibitions which it produces; and its property rights, as owner of such exhibitions, include the proprietary right to sell to others, who desire to purchase and to whom plaintiff desires to sell, licenses or other rights under which the purchasers are authorized to have their representatives attend such exhibitions, prepare oral and/or pictorial descriptions of such exhibitions and transmit such descriptions for broadcast over such, but only such, radio or television station or such geographical area or areas as may be agreed upon between plaintiff and such purchasers.

*Id.* at 770.

273. The Court emphasized the commercial value which descriptions of the games possessed: "Under ordinary circumstances, such commercial value extends for a period of at least twenty-four hours after the completion of the game. In unusually important or exciting games, such commercial value extends for years." *Id.* at 776.

274. Further, the Court recognized that the plaintiff incurred great expense in pro-

ducing the games, and that the "[p]laintiff did not intend to abandon its property right in news of the games," for "[c]lear public notice of this intention was given by appropriate language printed on its tickets of admission, in its contracts with broadcasters [and reporters] and by announcements during the broadcast of the game." *Id.* at 768.

275. The plaintiff, in other words, took "every reasonable precaution necessary and appropriate to safeguarding and protecting its rights in the descriptions and accounts of games played by its team." *Id.* at 776. Mere playing of the games and broadcasting of the games by licensees does not "constitute a general publication, dedication or abandonment thereof and do[es] not destroy the property rights of plaintiff or its licensees therein." *Id.* at 777.

276. The defendant's conduct "adversely affected the value of the broadcasting rights and privileges granted by plaintiff." *Id.* at 776. The plaintiff's licensees were "unfairly competed with because the unauthorized competitive [broadcast] stations, none of which pay for broadcasting rights, are in a position to undersell them." *Id.*

277. The plaintiff was deprived of "the just benefits of its labors and expenditures in respect of the creation and production of baseball games and public dissemination of descriptions and accounts thereof," *id.* at 777, and the defendant's action "injured plaintiff's goodwill and reputation with its licensees, will depreciate and destroy the value and marketability of plaintiff's property and render it impossible for plaintiff to realize in full the benefits of its rights," *id.*

278. Accordingly, the Court concluded that the defendant, who "contributed nothing to the performance nor to the facilities necessary to make the performance or the broadcasts or telecasts thereof possible," "misappropriated descriptions from the authorized broadcasts and telecasts of plaintiff's games," thus constituting "unfair competition." *Id.*

279. New York courts also have applied these principles to find misappropriation despite the fact that the defendant's endeavor was not aimed at providing a competing con-temporaneous account of an ongoing sports event.

280. In *Madison Square Garden Corp. v. Universal Pictures Co., Inc.,* 255 A.D. 459, 7 N.Y.S.2d 845 (1st Dep't 1938), *appeal and reargument denied,* 256 A.D. 807, 9 N.Y.S.2d 895 (1st Dep't 1939), the Court addressed the sufficiency of a complaint alleging that the defendants' motion picture constituted a misappropriation of the plaintiff's property interests in the New York Rangers professional hockey team (the "Rangers") and in Madison Square Garden (the "Garden").

281. The plaintiff owned and controlled the Rangers and the Garden. *Id.* at 847. The defendants produced a motion picture, fictional in nature, purporting to show professional ice hockey games involving the Rangers and Madison Square Garden. *Id.*

282. In holding that the complaint sufficiently alleged a claim of the defendant's misappropriation of the plaintiff's property, the Court stated:

Plaintiff had built up a valuable business licensing the use of genuine photographs taken in the Garden in feature moving pictures, and from that business had derived substantial revenue. That business had been created by the expenditure on plaintiff's part of large sums of money and of effort and skill in the management of its enterprise. In *Fisher v. Star Co., Inc.,* 231 N.Y. 414, 428, [132 N.E. 133], ... the Court of Appeals said: "Any civil right not unlawful in itself nor against public policy, that has acquired a pecuniary value, becomes a property right that is entitled to protection as such. The courts have frequently exercised that right. They have never refused to do so when the facts show that the failure to exercise equitable jurisdiction would permit unfair competition in trade or in any matter pertaining to a property right." ...

\* \* \* \* \* \*

In *Rudolph Mayer Pictures, Inc., v. Pathe News, Inc.,* [235 A.D. 774] ..., 255 N.Y.S. 1016, this court affirmed without opinion a preliminary injunction enjoining the defendants therein from distributing pictures which it took of a boxing match in

Ebbet's Field. The field was leased by Dodger A.C., Inc., which had agreed to give the plaintiff, Rudolph Mayer Pictures, Inc., exclusive rights to take and sell motion pictures of the Sharkey–Walker contest. The defendant, Pathe News Inc., knew of this arrangement but sent camera men to Ebbet's Field where they took pictures, and another camera man took long distance pictures from the roof of an adjoining building. Defendants thereafter combined the photographs into a news reel and distributed them. Defendants argued that plaintiffs had no property right which could be protected, that the right to take photographs of a boxing match was not a form of property known to the law, and that defendants' acts did not constitute unfair competition. In overruling these contentions, we necessarily held that defendants had violated a property right and should be enjoined.

*Madison Square Garden*, 7 N.Y.S.2d at 850–51.

283. The Court concluded that the defendants infringed on the plaintiff's "property right in its good name, its reputation, its good will built up at considerable expense, and its business in licensing genuine moving picture photographs to be used in feature films from which it had derived a substantial revenue." *Id.* at 851–52.

284. Application of the foregoing authorities and the principles gleaned therefrom to the instant action leads to the conclusion that defendants misappropriated NBA's proprietary interests in the NBA games in violation of New York common law.

285. Defendants' rush to market SportsTrax with or without NBA indicates the commercial potential of their product.

286. The *sine qua non* of this potential is the tremendous commercial value of NBA games, a value which would not exist but for years of NBA's effort and investment in cultivating a high level of public interest in NBA games.

287. Defendants, however, do not contribute in any manner, directly or indirectly, to this value upon which their product relies.

288. Instead, they enter the scene just in time to reap their profits "without having expended any time, labor, and money for the presentation of [the NBA games]." *Twentieth Century Sporting Club*, 300 N.Y.S. at 161; *accord National Exhibition Co.*, 143 N.Y.S.2d at 777 (emphasizing that the defendants "contributed nothing to the performance nor to the facilities necessary to make the performance or the broadcasts or telecasts thereof possible").

289. Further, they reap these profits from NBA's most valued asset—real-time NBA game information. *See National Exhibition Co.*, 143 N.Y.S.2d at 776 (finding that "[u]nder ordinary circumstances, such commercial value [of sports events] extends for a period of at least twenty-four hours after the completion of the game" and that "[i]n unusually important or exciting games, such commercial value extends for years").

290. As noted in paragraph 14, approximately four out of every five dollars earned by NBA is attributable to ongoing games. (Desser, Tr. at 11.)

291. It is precisely for this reason that NBA vigorously has protected its property rights in real-time information. It actively licenses rights to real-time information, it imposes clear and specific restrictions on media entities covering NBA games, and it warns patrons of NBA games through a variety of avenues that their license to enter NBA arenas does not include permission to transmit real-time information to others.

292. These activities by NBA demonstrate its unequivocal intention not to abandon its proprietary interests in real-time NBA game information. *See National Exhibition Co.*, 143 N.Y.S.2d at 768 (recognizing that the "[p]laintiff did not intend to abandon its property right in news of the game," because the plaintiff provided "[c]lear public notice of this intention ... by appropriate language printed on its tickets of admission, in its contracts with broadcasters and by announcements during the broadcast of the game").

293. The mere fact that the public may receive real-time broadcasts of NBA games via radio and television does not suggest

otherwise. *Id.* at 777 ("The playing of the games of plaintiff's team and communication of reports, descriptions and accounts of said games by plaintiff or by its licensees as aforesaid do not thereupon constitute a general publication, dedication or abandonment thereof and do not destroy the property rights of plaintiff or its licensees therein."); *International News Serv.*, 248 U.S. at 240, 39 S.Ct. at 73 ("The contention that the news is abandoned to the public for all purposes when published in the first newspaper is untenable. Abandonment is a question of intent...."), *quoted by Metropolitan Opera*, 101 N.Y.S.2d at 494.

294. Further, the fact that defendants are not replicating entire broadcasts of NBA games on their product, while a relevant consideration, does not alter my ultimate determination that they have engaged in unlawful conduct.

295. Defendants would have me strictly limit misappropriation to "entire act" replications. However, I do not interpret the "broad and flexible doctrine" of commercial misappropriation, *Metropolitan Opera*, 101 N.Y.S.2d at 488, as adhering to such bright-line rules. In addition, defendants' rule would allow parties to escape liability simply by choosing to omit some peripheral aspect of the event, thus conveying something less than the entire act. Equity will not stand for such a result; instead, case-by-case assessments must prevail.

296. In this case, I find that the quantity and contemporaneous nature of the information conveyed by SportsTrax, when viewed together with the other relevant facts discussed herein, is sufficient to constitute commercial misappropriation.

297. SportsTrax provides consumers of real-time NBA game data with portable, nationwide, contemporaneous, and core information about NBA games. It "covers it all, any game, any team, anytime, anywhere." (Point-of-Sale Flyer.)

298. Defendants also attempt to hide behind their utterly unpersuasive assertion that SportsTrax is simply another version of the evening news. I find without hesitation that their product crosses the boundary from mere media coverage of NBA games into competing commercial appropriation of these games.

299. One needs only to look at Motorola's advertising or to operate SportsTrax to realize that any newsworthy function and purpose performed by SportsTrax is greatly overshadowed by its function and purpose as a $200 toy for providing NBA fans with real-time game data.

300. By disseminating to fans the changing scores and leads on a real-time basis (albeit not necessarily on a goal-by-goal basis), defendants have appropriated the essence of NBA's most valuable property—the excitement and entertainment of a game in progress.

301. Finally, this $200 toy competes with NBA's wholly legitimate efforts to reap where it has sown.

302. NBA, its licensees, and defendants all seek to profit from the same product—real-time NBA game information. *See Mutual Broadcasting*, 30 N.Y.S.2d at 419 (finding the parties to be "competitors or potential competitors" because both relied on play-by-play descriptions of the games in order to attract listeners and enhance their profitability); *cf. Berni*, 838 F.2d at 648 ("Under New York law, a party need not be a direct competitor to institute an unfair competition action.").

303. For this reason, SportsTrax erodes NBA's ability to approach other commercial entities and offer them the degree of exclusivity in real-time depictions of NBA games that it could offer in the absence of SportsTrax. Thus, SportsTrax has affected adversely the value of NBA's real-time game information.

304. I do not pretend that SportsTrax threatens to replace a television broadcast of an NBA game. SportsTrax does represent, however, another alternative, and one without remuneration to NBA, for consumers of real-time NBA game information. It provides the essential factual information, such as the score, quarter, and time remaining, for following the course of an NBA game while it is in progress.

305. SportsTrax also competes with, and indeed relies on, Gamestats.

306. The reliance results from (a) Gamestats' provision of its real-time game data to radio and television stations for use by their broadcasters and for updating on-screen graphics, and (b) Stats' reporters' acquisition of their game data solely from broadcasts of NBA games. To the extent that the broadcasters rely on Gamestats' data in their play-by-play announcements and color commentary and that Stats' reporters rely on these announcements, commentary, and on-screen graphics for their updates, SportsTrax is dependent on Gamestats.

307. As for SportsTrax's competition with Gamestats, NBA already has engaged in discussions with entities, such as ESPN and Time Warner, to license real-time data which Gamestats, once fully operational, will have the capability of disseminating. SportsTrax, as a provider of real-time information, undoubtedly dilutes the exclusivity, and thus the value, of the rights which NBA has to offer.

308. Similarly, NBA intends to license a Gamestats data feed in connection with a real-time beeper product analogous to SportsTrax. In fact, NBA engaged in these precise discussions with defendants prior to defendants' decision to market SportsTrax without NBA's involvement.

309. In the end, after years of negotiations with NBA for a real-time product (some of which continued until January 1996) and without informing NBA that such a product would become a reality with or without NBA's involvement, defendants simply decided that the financial benefits of rushing SportsTrax to the retail market during the 1995–1996 NBA season outweighed the disadvantages of this litigation.

310. Accordingly, I hold that defendants, by depriving NBA "of the just benefits of its labors and expenditures in respect of the creation and production of [NBA] games and public dissemination of descriptions and accounts thereof," *National Exhibition Co.*, 143 N.Y.S.2d at 777, have commercially misappropriated NBA's proprietary rights in the NBA games in violation of New York common law.

## V. *Lanham Act Claims*

311. NBA also asserts claims under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) ("Section 43(a)"), for false designations of origin and false advertising.

312. According to Section 43(a):

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact which—

> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

17 U.S.C. § 1125(a).

313. This provision is part of the broader purpose of the Lanham Act, which is to "secure 'the public's interest in protection against deceit as to the sources of its purchases, [and] the businessman's right to enjoy business earned through investment in the good will and reputation attached to a trade name.'" *Fabrication Enters., Inc. v. Hygenic Corp.*, 64 F.3d 53, 57 (2d Cir.1995) (quoting *National Color Lab., Inc. v. Philip's Foto Co.*, 273 F.Supp. 1002, 1003 (S.D.N.Y. 1967)).

314. To accomplish this purpose, Section 43(a) "gives a statutory remedy to a party . . . whether or not the party has secured a federal registered trademark for the item at issue." *L. & J.G. Stickley, Inc. v. Canal*

*Dover Furniture Co., Inc.,* 79 F.3d 258, 262 (2d Cir.1996).

315. "Although originally interpreted narrowly, section 43(a) now is considered to confer protection against a myriad of deceptive commercial practices." *Resource Dev., Inc. v. Statue of Liberty–Ellis Island Found., Inc.,* 926 F.2d 134, 139 (2d Cir.1991). Section 43(a), however, "does not have a boundless application as a remedy for unfair trade practices." *Alfred Dunhill, Ltd. v. Interstate Cigar Co., Inc.,* 499 F.2d 232, 237 (2d Cir.1974).

316. "It principally provides for two distinct causes of action: false designation of origin or source, known as 'product infringement,' and false description or representation, known as 'false advertising.'" *Resource Dev.,* 926 F.2d at 139 (citation omitted); *accord Waldman Publishing Corp. v. Landoll, Inc.,* 43 F.3d 775, 780 (2d Cir.1994) (referring to these causes of action as false advertising, and "'passing off' (also called 'palming off') in which 'A' sells its product under 'B's' name, ... or 'reverse passing off,' in which 'A' sells 'B's' product under 'A's' name").

317. NBA complains of a host of "word[s], term[s], name[s], [and] symbol[s]," 15 U.S.C. § 1124(a), which it alleges constitute false advertising and false designations of origin in violation of Section 43(a). When the wheat of NBA's allegations is separated from the chaff, however, NBA is left with nothing but an unpersuasive attempt to craft a Section 43(a) claim out of the conduct of others, immaterial and isolated falsehoods, defendants' use of nonactionable terms and phrases, and negligible evidence, at best, of consumer confusion.

### A. *No Contributory Infringement*

318. Some of the statements about which NBA complains are statements of retailers of SportsTrax, not those of Motorola.[24]

319. It is true that liability under Section 43(a) may extend even beyond direct violators to contributory infringers. As the Supreme Court has held, "[e]ven if a manufacturer does not directly control others in the chain of distribution, it can be held responsible for their infringing activities under certain circumstances." *Inwood Lab., Inc. v. Ives Lab., Inc.,* 456 U.S. 844, 853–54, 102 S.Ct. 2182, 2188, 72 L.Ed.2d 606 (1982), *cited by Polymer Technology Corp. v. Mimran,* 975 F.2d 58, 64 (2d Cir.1992); *accord Display Producers, Inc. v. Shulton, Inc.,* 525 F.Supp. 631, 633 (S.D.N.Y.1981).

320. Contributory infringement liability, however, exists only "if a manufacturer or distributor intentionally induces another to infringe a trademark, or if it continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement." *Inwood Lab.,* 456 U.S. at 854, 102 S.Ct. at 2188.

321. NBA's primary complaint in this regard is the advertisement by Brookstone that SportsTrax is "officially licensed by the National Basketball Association," a statement which is facially false and which Brookstone has corrected and for which it has apologized to Motorola.[25]

322. This isolated erroneous advertisement resulted from Van Treese's (the Brookstone employee who drafted the advertisement) incorrect assumption that placing a question-mark by the words "officially licensed" would result in someone else's verifying this fact before printing the final advertisement. Obviously, this verification did not occur.

323. Within ten days of learning of Brookstone's error, Motorola reacted by

24. Because the parties concede that Motorola solely was responsible for the marketing of SportsTrax, I will refer only to Motorola in addressing NBA's Lanham Act claims.

25. NBA's contributory infringement claim also includes Brookstone's use of the phrases "NBA basketball" and "play by play," and Hammacher Schlemmer's use of the phrases "play-by-play action" and "as above" (referring to the description of the baseball SportsTrax, which noted that

it was officially licensed by Major League Baseball). I find, however, that even if Motorola had made these statements, NBA's Lanham Act claim would fail. I do not find these statements to be literally false and, therefore, NBA must show a likelihood of confusion under both the false advertising prong and the false designation of origin prong of Section 43(a). For the same reasons discussed *infra,* however, NBA has not made the requisite showing of confusion.

mailing Brookstone a letter noting the incorrect statement.

324. Motorola followed up its letter with numerous telephone calls, and Brookstone corrected its error in its next catalogue.

325. Based on these facts, including the various advertisements submitted by NBA after the Hearing, *see supra* note 12, I find that NBA has failed to satisfy its burden of persuasion that Motorola is a contributory infringer.

### B. *No False Advertising*

■ 326. NBA also complains that Motorola's statements regarding the origin of the information conveyed by SportsTrax constitute false advertising in violation of Section 43(a). Specifically, NBA complains of Motorola's literally false statement in a January 1996 press release that SportsTrax provides "updated game information direct from each arena" which "originate[s] from the press table" (Ex. 228), and Motorola's advertisement on the retail box and the retail display stand that the game updates are "from each arena."

327. Even assuming that the retail advertisement also is literally false, I find that NBA has failed to prove its false advertising claim.

328. As a general matter,

> [t]o establish a false advertising claim pursuant to § 43(a) the plaintiff must demonstrate that the message in the challenged advertisement is false. Falsity may be established by proving that (1) the advertising is literally false as a factual matter, *or* (2) although the advertisement is literally true, it is likely to deceive or confuse consumers.

*Lipton v. Nature Co.*, 71 F.3d 464, 474 (2d Cir.1995) (emphasis added).

■ 329. A plaintiff alleging false advertising, however, also must show that the defendants "misrepresented an 'inherent quality or characteristic'" of the defendant's product or service. *National Ass'n of Pharmaceutical Mfrs., Inc. v. Ayerst Lab.*, 850

F.2d 904, 917 (2d Cir.1988) (quoting *Vidal Sassoon, Inc. v. Bristol–Myers Co.*, 661 F.2d 272, 278 (2d Cir.1981); *accord Fur Info. and Fashion Council, Inc. v. E.F. Timme & Son, Inc.*, 501 F.2d 1048, 1051 (2d Cir.), *cert. denied*, 419 U.S. 1022, 95 S.Ct. 498, 42 L.Ed.2d 296 (1974); 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 27.07[2][g] (3d ed. 1996) [hereinafter *McCarthy* ].[26]

330. Although the Court of Appeals does not use the term "materiality," I interpret these decisions as embodying a requirement of "some showing that the defendant's misrepresentation was 'material' in the sense that it would have some effect on consumers' purchasing decisions." *McCarthy* § 27.04[4][a]; *accord id.* § 27.07[2][g]; *see Vidal Sassoon*, 661 F.2d at 278 ("[W]e are nevertheless convinced that Judge Stewart was correct in concluding that Sassoon would probably succeed in showing that the intent and total effect of the advertisements were to lead consumers into believing that Body on Tap was competitively superior, surely a representation regarding its 'inherent quality.'"); *see also American Tel. & Tel. Co. v. Winback and Conserve Program, Inc.*, 42 F.3d 1421, 1428 n. 9 (3d Cir.1994) (noting that a plaintiff alleging false advertising must prove, in addition to a likelihood of deception and other requirements, "that the deception is material in that it is likely to influence purchasing decisions") (citations and internal quotation marks omitted), *cert. denied*, — U.S. —, 115 S.Ct. 1838, 131 L.Ed.2d 757 (1995); *ALPO Petfoods, Inc. v. Ralston Purina Co.*, 913 F.2d 958, 964 (D.C.Cir.1990) ("[T]o prevail in a false advertising suit under section 43(a), a plaintiff must prove that the defendant's ads were ... actually or likely deceptive [and] material in their effects on buying decisions...."); *Pfizer, Inc. v. Miles, Inc.*, 868 F.Supp. 437, 450 (D.Conn. 1994) (applying the Section 43(a)'s materiality requirement to a false advertising claim based on a failure to disclose).

■331. Immaterial misrepresentations are not actionable because they do not

---

**26.** Although these Court of Appeals decisions were decided prior to the effective date of the 1988 amendments to Section 43(a) of the Lanham Act, I do not interpret the alterations to Section 43(a) as a congressional overruling of these decisions.

have an adverse effect on either of the groups which the Lanham Act seeks to protect. Such statements are, by their very definition, ones which the purchasing public would not rely on in making its purchasing decisions, and, accordingly, ones which do not have an adverse or unfair impact on others in the business community competing for these customers. *See Fabrication Enters.*, 64 F.3d at 57 (noting that the Lanham Act seeks to protect consumers and those in the business community).

332. In assessing whether a defendant's statements are material, a court must "consider the advertisement in its entirety" rather than engage in "disputatious dissection." *Federal Trade Comm'n v. Sterling Drug, Inc.*, 317 F.2d 669, 674 (2d Cir.1963) (applying the Federal Trade Commission Act, whose central purpose is to protect the public from deceptive statements about products), *cited by Vidal Sassoon*, 661 F.2d at 276.

333. In other words, "[t]he entire mosaic should be viewed rather than each tile separately." *Federal Trade Comm'n*, 317 F.2d at 674.

334. The rationale for this approach is that "[t]he buying public does not ordinarily carefully study or weigh each word in an advertisement." *Id.* The focus, therefore, must be on the "ultimate impression upon the mind of the [consumer]." *Id.*

335. After viewing the complained-of statements in this action in their context, I find that NBA has not satisfied its burden of proving materiality.

336. The heart and soul of SportsTrax is to provide regularly updated "Basketball Action Wherever You Go" about ongoing NBA games. (Retail Box.)

337. The statements as to the particular origin of game updates constitute nothing more than minutes about SportsTrax, a reality demonstrated by their lack of prominence in the advertisements.

338. The statement on the retail box, for example, is part of the clause, "Nationwide game updates from the arena." This clause constitutes one of a series of "Features" un-

impressively listed on the side of the retail box. The insignificance of the statement "from the arena" is illustrated further by omitting it entirely from the clause in which it is found. If that clause simply stated, "Nationwide game updates," I find it difficult to envision (and NBA has not shown otherwise) that consumers suddenly would reassess their decisions to purchase SportsTrax.

339. Accordingly, I find that NBA has failed to show that these statements upon which it bases its false advertising claim are "likely to influence purchasing decisions." *American Tel. & Tel. Co.*, 42 F.3d at 1428 n. 9.

## C. *No False Designations of Origin*

340. NBA also complains that defendants' use of various terms constitutes false designations of origin. NBA employs the term "origin" loosely, for a closer examination of its claim reveals that it is far from the typical scenario involving a false designation of origin.

341. NBA does not allege, for example, that defendants sold a product deceptively labeled the "Natural Basketball Association Official Basketball Monitor." Nor does NBA otherwise contend that defendants palmed off SportsTrax as a product manufactured by NBA.

342. Instead, NBA alleges that although defendants conspicuously label their product the "Motorola SportsTrax" and do not state thereon that it is licensed, approved, or sponsored by NBA, they have created a likelihood of confusion as to NBA's *sponsorship or approval* of SportsTrax by using terms such as "NBA," "National Basketball Association," "29 Pro Basketball Teams," "play by play," "minute by minute," "from the arena," "Eastern Conference," "Western Conference," "Los Angeles Clippers," "Los Angeles Lakers," and "Golden State Warriors" in connection with the packaging and advertising of SportsTrax.

343. As with the rest of NBA's Lanham Act claims, I find that NBA has not persuaded me of these allegations.

344. To prevail on such a claim, a plaintiff must show: (1) "that 'it has a valid

mark entitled to protection,'" and (2) "'that the defendant's use of it is likely to cause confusion.'" *Cadbury Beverages, Inc. v. Cott Corp.,* 73 F.3d 474, 477 (2d Cir.1996) (citation omitted) (making this statement in the context of a registered trademark infringement action under 15 U.S.C. § 1114, but noting in footnote 2 that Section 43(a) "prohibits similar conduct, though it is not limited to the uses of registered trademarks").

345. As for the first requirement, "Section 43(a) has been held to encompass a broad spectrum of marks, symbols, design elements and characters which the public directly associates with the plaintiff or its product." *Warner Bros., Inc. v. Gay Toys, Inc.,* 658 F.2d 76, 78 (2d Cir.1981).

346. This spectrum, however, is not without boundaries. As the Supreme Court has stated, although

> Section 43(a) "prohibits a broader range of practices than does § 32," which applies to registered marks, ... it is common ground that § 43(a) protects qualifying unregistered trademarks and that the general principles qualifying a mark for registration under § 2 of the Lanham Act are for the most part applicable in determining whether an unregistered mark is entitled to protection under § 43(a).
>
> \*    \*    \*    \*    \*    \*
>
> ... In order to be registered, a mark must be capable of distinguishing the applicant's goods from those of others. § 1052. Marks are often classified in categories of generally increasing distinctiveness; following the classic formulation set out by Judge Friendly, they may be (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful.... The latter three categories of marks, because their intrinsic nature serves to identify a particular source of a product, are deemed inherently distinctive and are entitled to protection. In contrast, generic marks—those that "refe[r] to the genus of which the particular product is a species," ...—are not registrable as trademarks....
>
> \*    \*    \*    \*    \*    \*
>
> Marks which are merely descriptive of a product are not inherently distinctive. When used to describe a product, they do not inherently identify a particular source, and hence cannot be protected. However, descriptive marks may acquire the distinctiveness which will allow them to be protected under the Act. Section 2 of the Lanham Act provides that a descriptive mark that otherwise could not be registered under the Act may be registered if it "has become distinctive of the applicant's goods in commerce." ... This acquired distinctiveness is generally called "secondary meaning." ... The concept of secondary meaning has been applied to actions under § 43(a)....
>
> The general rule regarding distinctiveness is clear: an identifying mark is distinctive and capable of being protected if it *either* (1) is inherently distinctive *or* (2) has acquired distinctiveness through secondary meaning.

*Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 767–71, 112 S.Ct. 2753, 2757–58, 120 L.Ed.2d 615 (1992) (citations omitted) (emphasis in original).

347. NBA has failed to demonstrate how phrases such as "play by play," "minute by minute," and "from the arena" are capable of distinguishing NBA's goods from those of others.

348. Even the terms "Eastern Conference" and "Western Conference" can apply equally to the National Hockey League as they can to the National Basketball Association.

349. Even if I overlooked NBA's attempt to hinge defendants' liability on these types of phrases, I cannot overlook NBA's utter failure to show what the Court of Appeals has referred to as "[t]he heart of a successful claim based upon [Section] 43(a)"—a likelihood of confusion as to the source or sponsorship of defendant's product. *Standard & Poor's Corp., Inc. v. Commodity Exch., Inc.,* 683 F.2d 704, 708 (2d Cir.1982); *accord Cadbury Beverages,* 73 F.3d at 477–78 ("[T]he inquiry turns to whether 'numerous ordinary prudent purchasers are likely to be misled or confused as to the source of the product in question because of the entrance in the marketplace of defendant's mark."); *Nikon Inc.*

**1164**

*v. Ikon Corp.*, 987 F.2d 91, 94 (2d Cir.1993) ("The key issue in these types of trademark cases is whether an appreciable number of consumers are likely to be misled or confused about the source of the product in question."); *Warner Bros.*, 658 F.2d at 79 (" '[T]he basic inquiry in a [Lanham Act] action is whether the public is likely to be misled into believing that the defendant is distributing products manufactured or vouched for by the plaintiff.' ") (quoting the district court's opinion).

350. Although "[n]o evidence of actual confusion is required in order to prove a likelihood of confusion," a factfinder may "infer from the absence of actual confusion that there was also no likelihood of confusion." *Inc. Publishing Corp. v. Manhattan Magazine, Inc.*, 616 F.Supp. 370, 386 (S.D.N.Y. 1985) (citation and internal quotation marks omitted), *aff'd* 788 F.2d 3 (2d Cir.1986); *accord Nikon*, 987 F.2d at 95 (" 'Although [evidence of actual confusion] is not necessary to show likelihood of confusion, its lack may under some circumstances be used against a plaintiff.' ") (citation omitted).

351. Further, even if actual confusion is shown, "[g]iven significant volume of sales over time, isolated instances of actual confusion may be disregarded as *de minimis.*" *Id.; see Nikon*, 987 F.2d at 95–96 (holding as not clearly erroneous a district court finding of "very limited evidence to support a claim of actual confusion" when the evidence demonstrated "[o]nly a couple of inconsequential isolated incidents" of actual confusion).

352. NBA argues that it presented sufficient evidence of actual confusion to satisfy this prong of its Lanham Act claim. It relies on Brookstone's false statement about NBA's licensing of SportsTrax and the deposition transcripts of employees of the four NBA teams with whom Motorola had sponsorship agreements. NBA has conducted no consumer surveys to show a likelihood of confusion.

353. I am not persuaded by this evidence, and, accordingly, I find that NBA's false designation claim is unavailing.

354. With respect to Brookstone's erroneous advertisement that NBA officially licensed SportsTrax, Van Treese testified she did not assume one way or the other whether this statement was correct; instead, she included it in her draft advertisement, placed a question-mark by it, and assumed that other Brookstone employees would verify the statement's truthfulness. (Van Treese Dep. at 45.) The advertisement was corrected and Brookstone apologized to Motorola for the error.

355. Motorola's agreements with the four NBA teams similarly do not persuade me of actual confusion, attributable to Motorola's use of actionable terms and phrases, that NBA approved of or sponsored SportsTrax.

356. To the extent that the Nets, Lakers, Clippers, and Magic actually were confused as to NBA's approval, I find that their confusion was based primarily on the fact that SportsTrax conveyed real-time information or that other teams already had agreements with Motorola similar to their own, not on Motorola's use of marks such as "NBA." Any actual confusion based on protectible marks is *de minimis.*

357. Therefore, NBA has failed to satisfy its burden of persuasion for all of its Lanham Act claims.

VI. *Communication Act Claim*

358. NBA's final claim alleges that defendants' conduct violates the Communications Act of 1934, 47 U.S.C. § 605(a) ("Section 605(a)"). I find this claim to be without merit.

359. Section 605(a) is comprised of five sentences, four of which proscribe certain conduct and one of which limits the application of the proscriptions found in the other four sentences.

360. The first sentence states:

[N]o person receiving, assisting in receiving, transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception, (1) to any person other than the addressee, his agent, or attorney, (2) to a person employed or

authorized to forward such communication to its destination, (3) to proper accounting or distributing officers of the various communicating centers over which the communication may be passed, (4) to the master of a ship under whom he is serving, (5) in response to a subpena issued by a court of competent jurisdiction, or (6) on demand of other lawful authority.

47 U.S.C. § 605(a).

361. The second sentence states: "No person not being authorized by the sender shall *intercept* any radio communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such *intercepted* communication to any person." *Id.* (emphasis added).

362. The third sentence states: "No person *not being entitled thereto shall receive* or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto." *Id.* (emphasis added).

363. The fourth sentence states:

No person having received any *intercepted* radio communication or having become acquainted with the contents, substance, purport, effect, or meaning of such communication (or any part thereof) knowing that such communication was *intercepted,* shall divulge or publish the existence, contents, substance, purport, effect, or meaning of such communication (or any part thereof) or use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto.

*Id.* (emphasis added).

364. NBA relies on an excerpt from *That's Entertainment, Inc. v. J.P.T., Inc.,* 843 F.Supp. 995, 999 (D.Md.1993), *quoted by That's Entertainment, Inc. v. Old Bridge Tavern,* No. 94C2612, 1996 WL 148045, at *2 (N.D.Ill. March 28, 1996), to argue that defendants, by acquiring their information from cable television broadcasts which allegedly are not intended for the use of the general

public, violated Section 605(a). According to this excerpt,

[w]hile ... the second sentence of Section [605(a) ] requires both an unauthorized "interception" and a divulgence of a cable television transmission in order to establish liability under the Act, ... the first and third sentences of Section [605(a) ] do not similarly require an "interception" of a cable transmission and clearly proscribe the unauthorized divulgence or use of communications which have been "received" legally for certain purposes.

*J.P.T., Inc.,* 843 F.Supp. at 999. NBA, although it has presented no evidence of an interception, argues that defendants impermissibly divulged the substance of communications regarding NBA games.

365. I am not persuaded by NBA's reliance on *J.P.T., Inc.*

366. The first sentence is "intended to regulate the conduct of *communications personnel—i.e.,* those legitimately involved in transmitting or receiving radio or wire communications—rather than to address the problem of unauthorized interception or reception of communications." *International Cablevision, Inc. v. Noel,* 859 F.Supp. 69, 75 (W.D.N.Y.1994) (interpreting the legislative history of the Communications Act) (emphasis in original), *vacated on other grounds,* 75 F.3d 123, 131 n. 4 (2d Cir.1996) ("The first sentence of § 605(a) is probably directed at communications personnel, as the district court indicated in *Noel*.").

367. The proscription found in this sentence, therefore, is inapplicable to defendants.

368. The second sentence also is inapplicable, but for a different reason. It has an interception requirement, *International Cablevision,* 75 F.3d at 131 n. 4, which has not been satisfied in this action.

369. The third sentence, contrary to the unsupported assertion from *J.P.T., Inc.* upon which NBA relies, similarly requires an interception and is inapplicable. *See* 47 U.S.C. § 605(a) (referring in the third sentence to persons "not being entitled ... [to] receive" the communication); *International Cablevision,* 75 F.3d at 133 ("[T]he act ... of inter-

ception (or assistance in interception) is a violation of the third sentence of § 605(a) . . . .").

370. Because the fourth sentence also requires an interception, NBA may not recover thereunder.

371. Therefore, NBA has failed to prove that defendants violated 17 U.S.C. § 605(a). *See California Satellite Sys. v. Seimon,* 767 F.2d 1364, 1366 (9th Cir.1985) ("As this circuit has held, liability under section 605 requires proof that a defendant has '(1) intercepted or aided the interception of, and (2) divulged or published, or aided the divulging or publishing of, a communication transmitted by the plaintiff.' ") (citation omitted).

## VII. *Interference With Contractual Relations Counterclaim*

372. In addition to NBA's claims, Motorola has alleged a counterclaim for NBA's interference with Motorola's contractual relations with the four NBA teams. I find that Motorola has failed to satisfy its burden of persuasion on its counterclaim.

373. New York common law requires a plaintiff to allege and prove "the existence of a valid contract and damages caused by the defendants' knowing and intentional interference with that contract without reasonable justification." *Minetos v. City Univ. of N.Y.,* 875 F.Supp. 1046, 1054 (S.D.N.Y.1995) (citing *Guard–Life Corp. v. S. Parker Hardware Mfg. Corp.,* 50 N.Y.2d 183, 428 N.Y.S.2d 628, 406 N.E.2d 445 (1980)).

374. "[T]he New York Court of Appeals has adopted the approach set forth in the Restatement (Second) of Torts § 767 (1979)" to determine the existence of a tortious interference with contractual relations. *Minetos,* 875 F.Supp. at 1054.

> It is really a balancing test that requires the balancing of several factors. These factors include: the nature of the defendant's conduct, the defendant's motive, the interests of the plaintiff with which the defendant interferes, the interests the defendant seeks to advance, the societal interests at stake, the proximity of the de-

fendant's conduct to the interference, and the relations between the parties.

*Id.*

375. "The key inquiry, ordinarily, . . . is whether the interference was 'without reasonable justification' or was improper." *Id.*

376. Assuming that all other elements are satisfied, I find that Motorola has failed to show that NBA acted without reasonable justification. Defendants' commercial misappropriation of NBA's proprietary interests constitutes ample justification for NBA's allegedly interfering conduct.

## VIII. *Entitlement to Injunctive Relief*

377. The final issue is whether, in light of defendants' commercial misappropriation, NBA is entitled to permanent injunctive relief.

378. "Generally, to obtain a permanent injunction a party must show the absence of an adequate remedy at law[,] irreparable harm if the relief is not granted," and success on the merits of its cause of action. *New York State Nat'l Organ. for Women v. Terry,* 886 F.2d 1339, 1362 (2d Cir.1989), *cert. denied,* 495 U.S. 947, 110 S.Ct. 2206, 109 L.Ed.2d 532 (1990); *accord Petereit v. S.B. Thomas, Inc.,* 63 F.3d 1169, 1185 (2d Cir. 1995) (noting that issuance of a permanent injunction "is inappropriate" "where an adequate remedy at law exists"), *cert. denied,* — U.S. ——, 116 S.Ct. 1351, 134 L.Ed.2d 520 (1996).

379. Because defendants' conduct in connection with SportsTrax constitutes commercial misappropriation and defendants continue to sell SportsTrax to consumers, I hold that monetary relief is inadequate and that NBA will suffer irreparable harm in the absence of injunctive relief.

## CONCLUSION

For the foregoing reasons, I hold that defendants' conduct in connection with SportsTrax constitutes commercial misappropriation and that plaintiffs are entitled to permanent injunctive relief to remedy defendants' ongoing unlawful conduct. All other claims for relief are denied.

1167

The parties shall submit proposed forms of judgment for permanent injunctive relief by July 31, 1996.

SO ORDERED.